Paisley GREEN, to his own use and to the use of Liberty Mutual Insurance Company

v.

POPE & TALBOTT, INC., a body corporate.

William RANDOLPH

v.

CENTRAL GULF STEAMSHIP CORP., a body corporate, and Lawrence E. Wilson

CENTRAL GULF STEAMSHIP CORP., a body corporate

v.

TERMINAL SHIPPING COMPANY and Maryland Port Authority.

Bert ROBINSON

v.

GRACE LINE, INC.

Oscar EADDY

v.

EMDER DAMPFERCOMPAGNIE A. G. AKTIENGESELLSCHAFT

v.

ROBERT C. HERD & CO., Inc.

James R. MILES

v.

SS PRODROMOS, her boilers, engine, tackle, etc., Sampasa Compania, the Western Maryland Railway Company, a Maryland corporation, and Westinghouse Electric Corporation, a Pennsylvania Corporation.

Nos. 4809, 4997.

Civ. Nos. 18189, 18220 and 19814.

United States District Court, D. Maryland.

April 6, 1971.

Franklin Freeman, Baltimore, Md., for libelant Paisley Green.

Raymond J. Cardillo and Howard Fine, Baltimore, Md., for libelant William Randolph.

H. Carl Butler, Baltimore, Md., for plaintiff Bert Robinson.

Jerome B. Monfred and Monfred & Lentz, Baltimore, Md., for plaintiff Oscar Eaddy.

David K. Ebersole, Jr., Leroy W. Preston, O'Connor & Preston, Baltimore, Md., for plaintiff James R. Miles; John J. O'Connor, Baltimore, Md., of counsel. Eugene A. Edgett, Jr., Baltimore, Md., for respondent, Pope & Talbott, Inc.

Randall C. Coleman, Thomas W. Jamison, III, and Ober Williams & Grimes, Baltimore, Md., for respondent Central Gulf Steamship Co. and another.

Southgate L. Morison, Randall C. Coleman, and John R. Crumpler, Jr., Baltimore, Md., for defendant Grace Line, Inc.

Southgate L. Morison, Richard R. Jackson, Jr., and Ober, Williams & Grimes, Baltimore, Md., for defendant and third-party plaintiff Emder Dampfercompagnie A. G. Aktiengesellschaft.

Richard R. Jackson, Jr., and Ober, Williams & Grimes, Baltimore, Md., for defendant Sampasa Compania.

Joseph H. Young and Paul V. Niemeyer, Baltimore, Md., for defendant The Western Maryland Railway Co.

Eugene A. Edgett, Jr., Baltimore, Md., for defendant Westinghouse Electric Corp.

Louis G. Close, Jr., and Due, Whiteford, Taylor & Preston, Baltimore, Md., for first-respondent impleaded Terminal Shipping Co.

Herbert F. Murray, Baltimore, Md., for second-respondent impleaded Md. Port Authority.

Eugene A. Edgett, Jr. and A. Douglas Owens, Baltimore, Md., for third-party defendant Robert C. Herd & Co., Inc.

WATKINS, District Judge.

■ These five, factually uncomplicated, cases bring us into some of the most troubled waters in admiralty today. Two of the five cases, *Green* and *Randolph*, were commenced as libels in admiralty; the other three, were instituted as civil actions at law. In each of the five cases, the party instituting the action was an employee of a stevedoring company who was injured on a pier or in a pier-based structure in the performance of his work. In each case, the employee brought his action against a shipowner, and in some cases others, making the usual allegations of the shipowner's negligence and the unseaworthiness of the vessel. That some of the cases were brought as libels in admiralty while the others were instituted as actions at law, is insignificant as far as common "substantive" questions are concerned. "For it is now clear that the maritime law controls all 'substantive' issues in the disposition of maritime claims regardless of the form or forum of the suit." Larios v. Victory Carriers, Inc., 316 F.2d 63, 65 (2d Cir. 1963).

Two of the cases, *Green* and *Robinson*, have proceeded to trial and await decision; the other three, are before this court on various defendants' motions to dismiss. Each longshoreman alleges that his action is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Accordingly, the threshold question presented by each of these cases is whether this court has admiralty jurisdiction over its subject matter.

■ Rule 9(h) is based upon 28 U.S.C. § 1333, which, in turn, paraphrases the constitutional grant of power. Article III, section 2 of the United States Constitution extends the judicial power, *inter alia,* "to all Cases of admiralty and maritime Jurisdiction." Thus, if these five controversies do not present cases of admiralty and maritime jurisdiction, this court lacks admiralty jurisdiction over their subject matter and, absent an independent basis of jurisdiction, they must be dismissed. Fed.R.Civ.P. 12(h); United States v. Mississippi Valley Barge Line Co., 285 F.2d 381 (8th Cir. 1960); 1A Barron & Holtzoff (Wright ed.), § 370 n.2. As the resolution of the jurisdictional questions presented herein depends as much on the facts of each case as the development of the law, it will be most helpful to discuss the former first.

THE FACTS

*Admiralty No. 4809*

Paisley Green was a longshoreman. On September 6, 1961, he was injured while working for the Jarka Corporation, a stevedoring company that had been engaged to unload a palletized cargo of canned goods from the SS P & T Builder, owned by the respondent Pope & Talbott, Inc. The ship was berthed at Pier 7, Western Maryland Railway, Port Covington, in the Port of Baltimore. On this pier was constructed a two-story warehouse where cargoes were stored. The pier itself had a movable second level, so that cargo could be transferred directly from the second level of the pier to the second story of the warehouse.

The palletized canned goods in question had been removed from the hold of the vessel by the ship's gear. This was done by placing pallet bars under the already palletized cargo and lifting a pallet or two to the first level of the pier. The ship's gear then transferred the cargo to the second level of the pier, adjacent to the second story of the warehouse, where a member of the stevedoring gang would remove the pallet bars and send the gear back for additional loads. After a pallet of canned goods was discharged on the second level of the pier, a tow-motor tractor would drive up from inside the second story of the warehouse, place its forklift or boom under the pallet, and after

lifting it to the appropriate height, drive back into the warehouse to place the pallet in its proper location for storage prior to ultimate distribution.

Green worked inside the second floor of the warehouse, about fifty feet from where the pallets were landed on the second level of the pier. His job was to "spot" the pallets in their proper location in the warehouse according to markings on the cargo. He was also responsible for seeing that the pallets were properly stored and for removing spillage when it occurred.

The pallets in question were not framed or strapped, but were glued together. They were stored in the warehouse by the tow-motor's tiering them two or three high. Green testified that at about 11:30 a. m. on the day of the accident, he noticed that several cases had fallen off the top of one of the stacks of palletized cans. He also testified that as the remaining cases did not seem to lean, he began to pick up the fallen cases when someone yelled, "Look out! Look out!" and he was struck in the back and knocked to the floor of the warehouse by another case falling from the same pallet. No testimony was offered to explain what made these particular cases fall from the pallet. No personnel from the ship were present at the accident, inside the second story of the warehouse and out of sight of the ship.

### Admiralty No. 4997

On November 30, 1963, William Randolph was employed as a longshoreman by Terminal Shipping Company, a stevedoring firm. Terminal Shipping had been engaged to stow cargo on the SS Green Bay, owned by the respondent Central Gulf Steamship Corporation, and berthed at Dundalk Marine Terminal in Baltimore. This pier was owned by the Maryland Port Authority and had constructed upon it a gantry, or a pier-based traveling crane, also owned by the Authority. This crane was being used to transfer steel drafts to the vessel from railroad gondola cars located on the pier. Its operator was Lawrence E. Wilson, the other respondent herein, who apparently had been hired to operate the crane by the Authority.

According to Randolph's libel, he was working in the railroad gondola car, assisting in unloading the steel drafts, "when suddenly, and without notice or warning, the hook affixed to said crane was prematurely, and at a great rate of speed, dropped into the gondola car in which the libelant was working, causing the libelant to be violently hurled from the gondola car to the pier surface, thereby causing him to suffer" injury. No allegation was made of any of the ship's personnel having anything to do with the accident. Nevertheless, Randolph filed his libel against the owner of the ship, Central Gulf, and the crane operator, Wilson.

Central Gulf, as might have been expected, impleaded Terminal Shipping, Randolph's employer, alleging a breach of its warranty of workmanlike service. The ship owner also impleaded the Authority, the pier and gantry owner, alleging an identical breach, as well as negligence on the part of the Authority's putative servant, Wilson.

For its part, the Authority answered the libel, denying the subject matter jurisdiction of the court and alleging that at the time of the accident, both the crane and its operator had been rented to Terminal Shipping and were under its control. The Authority renewed its jurisdictional argument at a later date by way of a "Motion to Dismiss for Lack of Jurisdiction." This case has not proceeded to trial and the Authority's motion is currently pending.

### Civil No. 18189

The SS Santa Olivia, owned by the defendant, Grace Line, Inc., was berthed at Pier 8, Canton Railroad, in Baltimore, Maryland, on December 6, 1965. Bert Robinson was a member of a longshoring gang working for The Cottman Company, the stevedoring firm that had been employed to unload Grace's ship.

The SS Santa Olivia had holds which were covered by pontoons which had to be removed when loading or discharging cargo. At the time complained of, the pontoons were being removed by the ship's boom and being lowered to the pier alongside of which the vessel was docked.

Robinson's job was to stand on the pier and, along with another member of his gang, guide the pontoons to a certain area of the pier where they were to be landed on chocks, or blocks of wood. When the first pontoon was lowered toward the pier, Robinson and his partner grasped it at either end, so that each man faced the other; then they began the guiding operation. While the other stevedore walked forward, Robinson walked backward. At the trial, Robinson testified that he tripped over a small piece of wood just before he reached the place where the pontoon was to be landed. He also testified that he had not seen the piece of wood, it was getting dark at the time of the accident, the pier was unlighted, and the piece of wood he tripped over was much smaller than the chocks used in the unloading operation and had nothing to do with the unloading of the SS Santa Olivia.

No evidence was offered as to the ownership of the piece of wood Robinson fell over. Likewise, there was no testimony presented to explain how this piece of wood came to be on the pier, or its nexus, if any, to the vessel or to any of the ship's officers or crew, none of whom was alleged to have been present.

### Civil No. 18220

A longshoreman, Oscar Eaddy, sues here Emder Dampfercompagnie A. G. Aktiengesellschaft, the owner of the MS Anni Nubel. On its part, the ship-owner has impleaded Robert C. Herd & Co., Inc., the stevedoring company that employed Eaddy at the time of the accident. For the purpose of the defendant and third-party plaintiff's pre-trial motion to dismiss for lack of jurisdiction, counsel for Eaddy and the ship-owner have stipulated to Eaddy's following version of the facts.

Eaddy was injured at about 2:30 p. m. on May 3, 1963, while working in a warehouse at the Dundalk Marine Terminal, Baltimore, Maryland. At the time of his injury, Eaddy was employed by Robert C. Herd & Co., Inc. as a longshoreman. The location of the accident was about twenty feet inside the door of the warehouse and about sixty feet from the side of the MS Anni Nubel, which was owned and operated by the defendant and third-party plaintiff.

Wooden pallets supporting a cargo of barrels were in this warehouse, some distance from where Eaddy and a fellow longshoreman were working, and were brought to the area where they were working by a forklift tractor. Plaintiff does not know who owned the pallets in question, but does maintain that the barrels were on the pallets when the longshoremen started work on May 3, 1963, that the longshoremen with whom he was working did not place the barrels on the pallets, and that the barrels may have been on the pallets when they were brought to the Dundalk Marine Terminal.

Most of the pallets supporting the cargo were not in good order on the morning of the injury and when it was believed that a particular pallet was not strong enough to support the weight of the barrels stacked on it, Eaddy's job, along with another longshoreman, was to assist in putting a good pallet, supplied by Herd, under the pallet thought to be too weak. Eaddy and his partner would make sure that the barrels were firmly on the pallets; then they would place a whiskey net over the barrels to hold them in place. Thereafter, the pallet would be picked up by another forklift tractor which "fed the hook," or took the pallet out under the MS Anni Nubel's cargo gear. The pallets would then be picked up by the ship's cargo gear and stowed in its cargo spaces. The whiskey net would be returned to the warehouse area for reuse.

Eaddy further maintains that a pallet with seven or eight barrels on it which appeared to be strong enough to support the weight of the barrels when carried on the MS Anni Nubel was brought to the area where he was working by a fork-lift tractor driver; that while in the process of placing a barrel weighing about seven hundred pounds and which was about twelve inches over the edge of the pallet back on the pallet so that the whiskey net could be placed around the barrels, a board on the pallet broke. This caused three crowbars which were tied together and which were standing in an upright position between the barrels to strike Eaddy on his left foot. Eaddy's position is that his injury was caused by the board on the pallet breaking and the fact that the crowbars were on the pallet in a position in which they should not have been.

Plaintiff does not know of any ship's officer being in the warehouse at the time of his injury.

*Civil No. 19814*

This case comes before the court on defendants' pre-trial motions to dismiss for lack of jurisdiction. For the purposes of these motions only, this court accepts the following facts as alleged in plaintiff's amended complaint.

James R. Miles, the plaintiff, was a longshoreman (galleryman or conveyor-belt operator) employed by the Louis Dreyfus Corporation. Dreyfus leased the Western Maryland Railway grain elevator with its gear, erected on Pier 2, Port Covington, in Baltimore, Maryland, from the defendant, Western Maryland Railway. Among the gear leased to Dreyfus was an electric starter motor used to operate the No. 2, long, outshore con-veyor-belt in the grain elevator. This motor was manufactured by the defendant, Westinghouse Electric Corporation, and sold to and maintained by the defendant railroad. The Jarka Corpora-tion, a stevedoring company, had been engaged to load or unload cargo from the defendant vessel, the SS Prodromos, owned by the defendant, Sampasa Com-pania, and berthed at Pier 2 on December 3, 1965.

On that day, at about 4:45 p.m., Miles was working inside the grain elevator. In the course of his duties, he began to start up the No. 2, long, outshore convey-or-belt when suddenly, and without warn-ing, an explosion took place inside the control box, causing the plaintiff to be burned and injured. No allegation is made that any of the ship's personnel was present at the time of the accident.

Whereas Miles predicates his claims against the first three defendants upon the admiralty and maritime jurisdiction of the court, he makes uncontroverted allegations based upon diversity of citizenship and the requisite jurisdictional amount as to the fourth defendant, Westinghouse Electric Corporation.

## THE LAW

### Background

As has been previously noted, Article III, section 2 of the Constitution extends the judicial power, among other things, "to all Cases of admiralty and maritime Jurisdiction." However, the breadth of that jurisdiction has never been entirely clear, especially as to maritime torts to persons.

Traditionally, as to maritime torts to persons, often called maritime injuries,[1] the method of determining

---

1. In this sense, the words "tort" and "injury" are frequently used interchangeably. This is appropriate except in the case where a seaman is injured or stricken ill during a period of maritime employment. In such a case, apart from any other benefit that may be available, the victim may claim the ancient remedy of maintenance and cure. This remedy arises out of the seaman's relation to the vessel and, strictly speaking, has its origins in neither tort nor contract, although it is more closely related to the latter. *See generally*, G. Robinson, Handbook of Admiralty Law in the United States, § 36 (1939). Therefore, cases of seamen where maintenance and cure are available are always within the admiralty jurisdiction of the federal courts. At this point, it should be noted that longshore-

whether the court's admiralty jurisdiction attached was to look to the situs of the injury. If the injury occurred upon navigable waters, the court had jurisdiction; if the injury happened on land, there was no jurisdiction. Occasionally, courts have required not only that the injury occur upon navigable waters, but also that the victim have some connection to maritime commerce at the time of his injury.

Thus, in 1939, Professor Robinson was accurately able to describe the then state of admiralty tort jurisdiction as follows:

Admiralty jurisdiction with respect to injuries to persons rather than to things * * * goes back to The Plymouth [70 U.S. (3 Wall.) 20, 18 L.Ed. 125 (1886)] rule that "every species of tort, however occurring, and whether on board a vessel or not, if upon the high seas or navigable waters, is of admiralty cognizance [at 36]," and particularly that "the wrong and injury complained of must have been committed wholly upon the high seas or navigable waters, or at least the substance and consummation of the same must have taken place upon these waters [at 35]." * * * Whether the victim's purpose, or employment in being on the waters, must have a maritime character is a longstanding dispute * * *. G. Robinson, Handbook of Admiralty Law in the United States, § 10 (1939).

* * * * * *

If it can be said that the place of injury is on a ship, there is maritime jurisdiction. * * * Certainly if the injured person is on the dock or wharf, or other structure equivalent to land, there is no such jurisdiction. Id. § 11, at 81.

But after 1939 things changed quickly. Only eighteen years later, Professors Gilmore and Black spoke of the erosion of tradition, commenting prophetically about the future:

Since 1940 the Supreme Court has been rewriting the law under which crew members and harbor workers may recover for death and injury. The rewrite job has gone far enough to make it clear that a revolution has taken place. If the Court adheres to its present position, the main outlines of the new law are reasonably clear, although the lower courts will be occupied for a generation in filling in the details. It is, however, less than a foregone conclusion that the Court will adhere to its position. At no time has that position commanded unanimity within the Court: single and multiple dissents have been common, and the Court has been narrowly divided on basic issues of law and policy. Changes in the Court's membership and shifts in the thinking of individual justices could convert a protesting minority into a comfortable majority. G. Gilmore & C. Black, The Law of Admiralty, § 6-1 (1957).

Accordingly, an outline of the "revolution" between 1940 and 1957, as well as of the continuing conflict since, is essential to an understanding of the present state of admiralty tort jurisdiction upon which the proper resolution of these five controversies depends.

The extensions of the situs rule of admiralty tort jurisdiction in the last twenty-five or thirty years have come in three areas. Only two need we consider but in passing. The third area is the Jones Act, 46 U.S.C. § 688, which gives a seaman a cause of action in negligence against a shipowner for any personal injuries suffered in the course of the seaman's employment. For many years, it was thought that the phrase "in the course of his employment" applied only to injuries suffered upon navigable waters. But in O'Donnell v. Great Lakes

men are not seamen for the purposes of maintenance and cure and thus are not entitled to this remedy. Pope & Talbot, Inc.

v. Hawn, 346 U.S. 406, 413, 74 S.Ct. 202, 98 L.Ed. 143 (1953).

Dredge & Dock Co., 318 U.S. 36, 63 S.Ct. 488, 87 L.Ed. 596 (1943), the Supreme Court held otherwise, finding that the Jones Act remedy depended like maintenance and cure on the maritime relation and that therefore the situs of the injury was irrelevant. However, as longshoremen are not "seamen" under the Jones Act, *see* Swanson v. Marra Bros., Inc., 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045 (1946), and all five of the instant cases involve longshoremen, it would not be helpful to elaborate any more on the Jones Act's extension inland of admiralty tort jurisdiction. What is important for these controversies are the inland extensions of admiralty tort recovery wrought by the maritime concept of sea worthiness and by The Extension of Admiralty Jurisdiction Act of 1948, 46 U.S.C. § 740.

*Seaworthiness: 1789–1946*

The duty of a shipowner to his seamen to supply a seaworthy vessel is not new. It was recognized in The Cyrus, 7 Fed.Cas. 755 (No. 3,930) (D.C.D.Pa. 1789). However, in 1789 and for more than a hundred years thereafter, the unseaworthiness of a vessel only gave its seamen the privilege of leaving the ship's service without loss of pay or penalty for desertion; no right to recover damages was recognized until the Supreme Court's decision in The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903) (dictum).

Other than maintenance and cure, unseaworthiness provided a seaman his only remedy against the shipowner until the Jones Act was passed in 1920. For approximately twenty years after passage of the Jones Act, "seaworthiness" was in limbo. This was because of the belief at that time that a seaman had to elect between basing his case on a Jones Act negligence action and a maritime law action for unseaworthiness. As it was also thought that unseaworthiness could only be found if the injury resulted from an inherent defect in the vessel or its appurtenances, as distinguished from a condition caused by operating negligence, premising recovery upon un-

seaworthiness came into disuse as seamen elected the surer relief of the Jones Act negligence action.

The concept of seaworthiness began to flourish again in the 1940's when it became evident that seamen need not make an election between negligence and unseaworthiness, *see* The Law of Admiralty, *supra*, § 6–23, and that the unseaworthiness concept included conditions caused by operating negligence. Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944).

For longshoremen, 1946 was an important year. Although the Supreme Court held in Swanson v. Marra Bros., Inc., *supra*, that longshoremen were not Jones Act "seamen," it did extend the shipowner's duty to provide a seaworthy vessel to stevedores in Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). This was in the context of seaworthiness as a theory of recovery —not as a basis of jurisdiction—and was to be of vital importance as later events have proved. In discussing post-1946 events, however, it is necessary first to note the enactment of The Extension of Admiralty Jurisdiction Act.

*Passage of the Extension of Admiralty Jurisdiction Act*

On June 1, 1948, the Second Session of the Eightieth Congress approved Public Law 695, since known as The Extension of Admiralty Jurisdiction Act, 46 U.S.C. § 740. That legislation provides in pertinent part:

> The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land. Act of June 19, 1948, ch. 526, 62 Stat. 496, 46 U.S.C. § 740.

The Act's primary purpose, as is evident from its legislative history, *see* 1948 U.S.Code Cong. Service, pp. 1898–1904, was to give the owners of land-based structures such as piers and bridges an action in admiralty against a damaging

vessel and its owner. Prior to enactment of the Act, an owner of a pier or bridge only had recourse to the remedies of local law when his structure was damaged by a vessel. The legislation corrected this anomaly of the situs rule of admiralty tort jurisdiction, and, at the same time, by its language, gave a cause of action in admiralty to persons whose injuries were "caused by a vessel on navigable water." As the legislative history scarcely mentions it, the giving of a cause of action to persons was apparently meant to be only secondarily important; moreover, the Act was silent as to the theory of this new liability, *i. e.*, unseaworthiness and/or negligence. However, it is clear that nothing in the language of the Act or in its legislative history indicates any intention to extend inland the maritime concept of seaworthiness as an independent basis for admiralty tort jurisdiction. Unfortunately, as a review of later cases indicates, the courts have not always appeared to have been cognizant of these facts.

*Post-1948 Developments*

*(a) "Seaworthiness" Comes Ashore*

Two years after enactment of The Extension of Admiralty Jurisdiction Act, 46 U.S.C. § 740, but without its aid, Chief Judge Learned Hand of the United States Court of Appeals for the Second Circuit brought "seaworthiness" ashore, fathering its mutation. In Strika v. Netherlands Ministry of Traffic, 185 F. 2d 555 (2d Cir.), *cert. denied,* 341 U.S. 904, 71 S.Ct. 614, 95 L.Ed. 1343 (1950), a longshoreman brought suit to recover damages for injuries sustained when a pontoon hatch cover fell from the ship's tackle and injured him while he was standing on the pier. Despite the considerable merit of the defendant's position that an action for unseaworthiness is in tort and that there is no admiralty jurisdiction for breaches of duty occurring on land, the Second Circuit refused to adopt the defendant's view. Chief Judge Hand, speaking for the majority of a divided panel, used these expansive terms:

We should have found this a serious obstacle [to jurisdiction], were it not for O'Donnell v. Great Lakes Dredge & Dock Co. * * * and the *ratio decidendi* of Swanson v. Marra Brothers, Inc. * * *; but those decisions appear to us to settle it that such a tort, arising as it does out of a maritime "status" or "relation," is cognizable by the maritime law whether it arises on sea or on land. For it seems to us to follow, if Congress has power to impose liabilities in favor of seamen for lapses of care on shore, that Congress at least would have power to impose a similar liability when the lapse is in furnishing a seaworthy ship. It is true that Congress has not intervened as to seaworthiness; yet there is no more reason to circumscribe more narrowly the duty which The Osceola, * * * established as part of the maritime law, than the Constitution circumscribes the power of Congress, for both in the end are based upon the same provision. * * * [A]lthough we have been unable to find a decision holding that a seaman, injured ashore by unseaworthy ship's gear, can recover, we have no doubt that he could; and, if a seaman can, we see no reason to question the ability of a longshoreman also to recover, for that follows from the reasoning of Seas Shipping Co. v. Sieracki, * * * especially when it is read with Swanson v. Marra Brothers, Inc. * * * Public Law 695 of June 19, 1948 * * * has now probably laid all such doubts, but *we think that it was not necessary in order to support recovery in this particular situation.* 185 F.2d at 558 (emphasis added).

Thus, not by reliance on the Extension Act, but by judicial fiat, the Second Circuit extended the shipowner's warranty of seaworthiness, previously limited to injuries sustained on navigable waters, to injuries to seamen and longshoremen injured on the pier by the ship's gear. At the same time, the court brought admiralty tort jurisdiction ashore for the first time, making the traditional war-

ranty of seaworthiness *not only* a theory of recovery *but* an independent basis for admiralty jurisdiction.

### (b) Gutierrez

Although Strika v. Netherlands Ministry of Traffic, *supra,* was not heard by the Supreme Court on its merits, in Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963), the Court seemed, at least at first blush, to have embraced Chief Judge Hand's view. However, much of that decision was predicated on the Extension of Admiralty Jurisdiction Act, 46 U.S.C. § 740, which was not relied upon by the Second Circuit in *Strika.* Moreover, careful analysis of *Gutierrez* and the Supreme Court's later decisions demonstrates that the Court has not given its imprimatur to *Strika's* unseaworthiness - as - an - independent - basis - for - admiralty-tort-jurisdiction reasoning; on the contrary, the Supreme Court has clearly refused to allow the concept of unseaworthiness to be used as an independent basis for admiralty jurisdiction.

Gutierrez was a longshoreman unloading a vessel in Puerto Rico. He slipped on some loose beans spilled on the dock and was injured. The beans he slipped on had leaked onto the dock from broken and defective bags that were being unloaded as part of the ship's cargo. Later, Gutierrez filed a libel against the vessel claiming damages for injuries caused by the ship's unseaworthiness *and* by the negligence of its owner.

Without considering the jurisdictional issues which might have been, but were not, raised, the district court found that Waterman knew or should have known that injury was likely to result to persons working around the beans spilled from the defective bags and that the shipowner was negligent in allowing such cargo to be unloaded. The court also found that Gutierrez suffered his injuries as the proximate result of Waterman's negligence and the unseaworthiness of the ship's cargo or cargo containers; therefore, it entered judgment in favor of Gutierrez. Gutierrez v. The

S.S. Hastings, 193 F.Supp. 894 (D.P.R. 1961).

On appeal to the United States Court of Appeals for the First Circuit, Waterman S.S. Corp. v. Gutierrez, 301 F.2d 415 (1st Cir. 1962), again without any question of jurisdiction being considered, the district court was reversed. The First Circuit held that Waterman had not been negligent as a matter of law because it had no control or right to control the pier on which Gutierrez was injured; it also held that the warranty of seaworthiness did not extend to cargo containers being unloaded from the ship where the impact of the injury was felt on the pier.

The Supreme Court granted certiorari, 371 U.S. 810, 83 S.Ct. 40, 9 L.Ed.2d 53 (1962), "to resolve the apparently troublesome question as to the shipowner's liability for his torts which have impacts on shore." 373 U.S. at 209, 83 S.Ct. at 1187. At the outset, the Court considered the jurisdictional question, presented to it for the first time:

Respondent contends that it is not liable, at least in admiralty, because the impact of its alleged lack of care or unseaworthiness was felt on the pier rather than aboard ship. Whatever validity this proposition may have had until 1948, the passage of the Extension of Admiralty Jurisdiction Act, 62 Stat. 496, 46 U.S.C. § 740, swept it away when it made vessels on navigable water liable for damage or injury "notwithstanding that such damage or injury be done or consummated on land." * * * Various far-fetched hypotheticals are raised, such as a suit in admiralty for an ordinary automobile accident involving a ship's officer on ship business in port, or for someone's slipping on beans that continue to leak from these bags in a warehouse in Denver. We think it sufficient for the needs of this occasion to hold that *the case is within the maritime jurisdiction under 46 U.S.C. § 740 when, as here, it is alleged that the shipowner commits a tort* [3] *while or before the ship is being unloaded, and the impact*

*of which is felt ashore at a time and place not remote from the wrongful act.* *Id.* at 209–210, 83 S.Ct. at 1188 (emphasis added) (footnote in original).

Footnote 3, inserted above by the Supreme Court, should be read together with the quoted language:

3. The question of whether the warranty of seaworthiness extends to longshoremen on the dock is considered, *infra,* at pp. 213–214, 83 S.Ct. at p. 1190.

Then, turning to page 213 *et seq.,* 83 S.Ct. 1185, one finds the Court agreeing with the language of Strika v. Netherlands Ministry of Traffic, *supra,* and the cases following it which allowed the unseaworthiness of a vessel to be used as a theory of *recovery* for injuries sustained ashore. The Court next went on to define the proper application of the seaworthiness doctrine:

    *   *   *   [T]hings about a ship, whether the hull, the decks, the machinery, the tools furnished, the stowage, or the cargo containers, must be reasonably fit for the purpose for which they are to be used.   *   *   * When the shipowner *accepts* cargo in a faulty container or allows the container to become faulty, he assumes responsibility for injury that this may cause to seamen or their substitutes *on or about the ship.* *Id.* at 213–14, 83 S.Ct. at 1190 (emphasis added).

Having discussed the proper application of the seaworthiness doctrine, the Court considered Waterman's assertion that the warranty of seaworthiness did not attach to Gutierrez because of the situs of his injury on the pier. Significantly, this position of the respondent postured seaworthiness as a theory of recovery, *not* as a basis for jurisdiction. Mr. Justice White, for the Court, commented:

The second question [of whether the shipowner's warranty of seaworthiness extends to longshoremen on the pier who are unloading the ship's cargo] is one of first impression in this Court, although other federal courts have already recognized that the case law compels this conclusion.   *   *   *

We agree with this reading of the case law and hold that the duty to provide a seaworthy ship and gear, including cargo containers, *applies* to longshoremen unloading the ship whether they are standing aboard ship or on the pier. *Id.* at 214–15, 83 S.Ct. at 1190–91 (emphasis added).

Accordingly, the Supreme Court reinstated the judgment of the district court in *Gutierrez,* resolving the jurisdictional question affirmatively and deciding that the warranty of seaworthiness extends to longshoremen on the pier who are unloading the vessel and sustain injuries emanating from the ship. Unfortunately, the decision in *Gutierrez* has not solved all possible problems; in fact, it has caused mass confusion in the lower federal courts.

The extent of the present difficulty has recently been stated by Professor Alfred S. Pelaez, writing in volume 7A of Moore's Federal Practice:

While *Gutierrez* does make clear that it is solely the status of the person injured, and not the situs of the occurrence, that determines the applicability of the near absolute protection of the maritime doctrine of unseaworthiness, it does not disclose whether situs can be used to *cut off or terminate that right, or to prevent that right from ever arising.* The Court's decision, relying as it does both upon the Extension of Admiralty Jurisdiction Act *and* the reasoning of *Strika,* never quite makes clear whether either the Act or historical maritime precedent authorized the extension of the admiralty jurisdiction to Gutierrez' claim or whether *both* the legislative and judicial processes working in concert were necessary to achieve such a result.   *   *   * [S]uch a distinction may be of vital significance should the inland encroachments of the Extension of Admiralty Jurisdiction Act be, as is probable, denied *   *   * far-ranging application *   *   *.

* * * [T]he Extension of Admiralty Jurisdiction Act has not yet solved all problems. Just how far inland is this Act to be applied? * * * [W]ould it have applied to Gutierrez had he slipped on loose beans while carrying the cargo of the S.S. Hastings into a warehouse across the street from the dock? Or, had he slipped on the continuously leaking beans—as the Court of Appeals facetiously said— while laboring in a warehouse in Denver? And, even more important, can the Extension of Admiralty Jurisdiction Act in any way affect *either status or the finding of a maritime connection,* or must it be utilized only as a means of disregarding the situs of the occurrence so that causes clearly maritime can now be brought within the admiralty? These, clearly, are the critical questions; and, these are the questions that still remain to be solved. 7A Moore's Fed. Practice (2d ed.) ¶ .325[4] (1970) (emphasis in original).

Regrettably, there remain no definitive answers. But to the extent that these critical questions present themselves in the five instant controversies, this court must confront them. Happily, the Supreme Court has recently turned its attention to the admiralty and *Gutierrez* is not its final guidance. This makes it unnecessary to elaborate on the glut of intervening lower federal court cases, which are, on the whole, in a hopeless state of confusion. Many properly focus on the meaning of "caused by a vessel," as that phrase is used in the Extension of Admiralty Jurisdiction Act, on the situs of the injury, the scope of the loading and unloading processes, and the appropriate inland extension of the concept of seaworthiness. However, more than a few fail to distinguish between the distinct concepts of negligence and seaworthiness; others make the mistake of equating maritime status, to injury caused by the vessel, to jurisdiction, to recovery; some, erroneously in this court's view, convert seaworthiness from a theory of recovery into an independent basis for admiralty tort jurisdiction; most unfortunately, the vast majority fail to distinguish between the independent, but related, questions of the breadth of admiralty tort jurisdiction, how far inland the maritime concept of seaworthiness extends, and the termini of the loading and unloading operations.

■ Of course, had the United States Court of Appeals for the Fourth Circuit spoken authoritatively in the area, its view would be binding on this court and dispositive of the questions under consideration. However, in no case cited by any of the parties, or that has come to the attention of the court, has the Fourth Circuit addressed itself to the issues presented by these five controversies. Therefore, for guidance, this court looks to the Supreme Court's most recent pronouncements.

*(c) Nacirema and Usner*

On December 9, 1969, the Supreme Court filed its long-awaited opinion in Nacirema Operating Co., Inc. v. Johnson, 396 U.S. 212, 90 S.Ct. 347, 24 L.Ed.2d 371 (1969), *rehearing denied,* 397 U.S. 929, 90 S.Ct. 895, 25 L.Ed.2d 109 (1970). In that case, the Court reversed the United States Court of Appeals for the Fourth Circuit, sitting en banc, in Marine Stevedoring Corp. v. Oosting, 398 F.2d 900 (4th Cir. 1968). The Fourth Circuit had reversed the judgments of this court in Johnson v. Traynor and Klosek v. Traynor, 243 F.Supp. 184 (D. Md.1965) (consolidated), and the judgment of the United States District Court for the Eastern District of Virginia in Avery v. Oosting, 245 F.Supp. 51 (E.D.Va.1965). Two of the three cases ultimately decided by the Supreme Court originated in the judicial process before the undersigned judge. All private counsel in those two cases represent various parties here. In fact, because of *Nacirema's* obvious importance, by order of this court dated December 31, 1968, final decision in all of the present cases, except *Miles* which had only recently been instituted, was stayed pending the Supreme Court's decision.

In *Nacirema*, the facts were even more uncomplicated than those here. Johnson and Klosek were longshoremen employed by Nacirema Operating Co., Inc., a stevedoring firm; Avery was similarly employed by Old Dominion Stevedoring Corporation. All were "slingers"—men who worked in railroad cars located on piers attaching cargo to ship's cranes for loading onto the vessels. Klosek was killed and the others injured when cargo hoisted by the ship's crane swung back and struck each longshoreman, knocking him to the pier.

Claims were timely-filed under the Longshoremen's and Harbor Workers' Compensation Act of 1927, 33 U.S.C. §§ 901–50. In each case, a Deputy Commissioner of the United States Department of Labor denied compensation on the ground that the victims had not received their injuries "upon the navigable waters of the United States," as required by section 3(a) of the Act, 33 U.S.C. § 903(a). The district courts upheld the Deputy Commissioners' decisions, after which a divided Fourth Circuit reversed, holding that pier injuries are covered by the Act.

In reinstating the judgments of the district courts, the Supreme Court construed the Longshoremen's and Harbor Workers' Compensation Act as not covering injuries sustained on a pier. It also reaffirmed long-familiar principles of admiralty tort jurisdiction while further interpreting the Extension of Admiralty Jurisdiction Act, first considered by the Court in *Gutierrez*. It is significant in this regard that Mr. Justice White, the author of the majority opinion in Gutierrez v. Waterman S.S. Corp., *supra*, also wrote the opinion of the Court in *Nacirema*.

After stating the case, Mr. Justice White spoke first to the status of piers and similar land-based structures:

> Since long before the Longshoremen's Act was passed, it has been settled law that structures such as wharves and piers, permanently affixed to land, are extensions of the land. * * * We reject the alternative holding of the Court of Appeals that all injuries on these piers, despite settled doctrine to the contrary, may now be considered injuries on navigable waters * * *. 396 U.S. at 214–15 & n.6, 90 S.Ct. at 349–50 & n.6.

Then the Court rejected respondents' contention that the Longshoremen's Act was intended by Congress to be "status" rather than "situs" oriented. Having done so, Mr. Justice White turned to respondents' alternative argument that what Congress had failed to accomplish in 1927, it had successfully done in 1948 when it passed the Extension of Admiralty Jurisdiction Act, 46 U.S.C. § 740. As will be recalled, that Act provides in pertinent part:

> The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land.

According to the respondents, this language of the Extension Act expanded coverage under the Longshoremen's Act. The Fourth Circuit accepted this position, Judge Sobeloff suggesting for the majority of the court that the alternative was the toleration of a series of "harsh and incongruous" differences in the treatment of longshoremen performing similar tasks. 398 F.2d at 906–07. However, the Supreme Court read the Extension of Admiralty Jurisdiction Act differently:

> By its very choice of language, the Act re-enforces the conclusion that Congress was well aware of the distinction between land injuries and water injuries and that when it limited recovery to injuries on navigable waters, it did not mean injuries on land. The Act no doubt extended the admiralty tort jurisdiction to ship-caused injuries on a pier. But far from modifying the clear understanding in the law that a pier was an extension of land and that a pier injury was not on navigable waters but

on land, the Act accepts that rule and nevertheless declares such injuries to be maritime torts if caused by a vessel on navigable waters.

The Extension Act was passed to remedy the completely different problem that arose from the fact that parties aggrieved by injuries done by ships to bridges, docks, and the like could not get into admiralty at all. There is no evidence that Congress thereby intended to amend or affect the coverage of the Longshoremen's Act or to overrule Swanson v. Marra Bros., *supra,* decided just two years earlier. While the Extension Act may have the effect of permitting respondents to maintain an otherwise unavailable libel in admiralty, *see* Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, [83 S.Ct. 1185, 10 L.Ed.2d 297] (1963),[2] the Act has no bearing whatsoever on their right to a compensation remedy under the Longshoremen's Act.

There is much to be said for uniform treatment of longshoremen injured while loading or unloading a ship. But even construing the Extension Act to amend the Longshoremen's Act would not effect this result, *since longshoremen injured on a pier by pier-based equipment would still remain outside the [Extension] Act.* And construing the Longshoremen's Act to coincide with the limits of admiralty jurisdiction—whatever they may be and however they may change —simply replaces one line with another * * *. 396 U.S. at 222–23, 90 S.Ct. at 353–54 (footnotes omitted) (emphasis added).

Thus, the obvious thrust of Mr. Justice White's discussion * * * was that even were the Longshoremen's Act construed as incorporating the Extension Act, the incongruities feared by the Fourth Circuit would not be lessened. Uni-

form treatment of longshoremen's injuries could not be achieved, since *even under the Extension Act injuries on a pier resulting from pier-based equipment are not cognizable in admiralty*—even though they occur in connection with the loading or unloading of a ship. Gebhard v. S.S. Hawaiian Legislator, 425 F.2d 1303, 1314 (9th Cir. 1970) (dissenting opinion) (emphasis in original).

Accordingly, this court is of the opinion that Nacirema Operating Co., Inc. v. Johnson, *supra,* is dispositive of the jurisdictional questions presented by the five instant controversies. It is certainly indicative of the new trend of cases prophesied by Professors Gilmore and Black almost fifteen years ago, *supra* at 13–14. That *Nacirema* is not an isolated case is indicated by the Supreme Court's recent decision in Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971).

In *Usner,* there was clearly admiralty tort jurisdiction under either the traditional test of situs or the expanded test of the Extension of Admiralty Jurisdiction Act. Usner was engaged with his fellow longshoremen in loading cargo aboard the SS Edgar F. Luckenbach. He was injured when a sling attached to the ship's boom hit him when the operator of the boom, a fellow longshoreman, lowered the cargo sling too quickly. The situs of Usner's injury was not the pier; he was located on a barge in navigable waters positioned alongside the vessel. Therefore, Usner's injury was susceptible to admiralty tort jurisdiction under the traditional situs test. As Usner was injured when struck by a sling attached to the ship's boom, there was also jurisdiction under the Extension of Admiralty Jurisdiction Act. With unseaworthiness thus premised as a basis for *recovery,* the respondent ship moved for summary judgment in the district court upon the ground that a single

---

2. This comment is obviously valid as Johnson, Klosek, and Avery were all injured by the ship's tackle; consequently, their injuries were clearly ship-caused. How-

ever, in the present controversies, by contrast, all of the instrumentalities of injury were pier based and, unlike *Gutierrez,* none emanated from the vessel.

negligent act by a fellow longshoreman could not render the ship unseaworthy. The district court denied the motion but allowed an interlocutory appeal. Allowing the appeal, the United States Court of Appeals for the Fifth Circuit reversed the district court and stated its view that " '[i]nstant unseaworthiness' resulting from 'operational negligence' of the stevedoring contractor is not a basis for recovery by an injured longshoreman." 413 F.2d 984, 985–86 (5th Cir. 1969). The Supreme Court granted certiorari, 397 U.S. 933, 90 S.Ct. 940, 25 L. Ed.2d 114 (1970), acknowledging a conflict among the circuit courts of appeal. The Court then affirmed the Fifth Circuit and in so doing emphasized the distinction between seaworthiness and negligence, as well as defining the meaning of each of these concepts.

\* \* \* the doctrine of *liability* based upon unseaworthiness has experienced a most extraordinary expansion in a series of cases decided by this Court over the last 25 years. The Court's decisions in some of those cases have been severely questioned, by dissenting Justices and by others, on the basis of history, reason, and logic. The present case, however, offers no occasion to re-examine any of our previous decisions. We may accept it as fully settled that a shipowner's liability for an unseaworthy vessel extends beyond the members of the crew and includes a longshoreman like the petitioner. We may accept it as settled, too, that the shipowner is liable though the unseaworthiness be transitory, and though the injury be suffered elsewhere than aboard the ship. But these propositions do not dispose of the case before us. For the question here goes to the very definition of what unseaworthiness is and what it is not.

A major burden of the Court's decisions spelling out the nature and scope of the *cause of action for unseaworthiness* has been insistence upon the point that *it is a remedy* separate from, independent of, and additional to other claims against the shipowner, whether created by statute or under general maritime law. More specifically, the Court has repeatedly taken pains to point out that liability based upon unseaworthiness is wholly distinct from liability based upon negligence. The reason, of course, is that unseaworthiness is a *condition,* and how that condition came into being— whether by negligence or otherwise— is quite irrelevant to the owner's liability for personal injuries resulting from it.

\* \* \*

What caused the petitioner's injuries in the present case, however, was not the condition of the ship, her appurtenances, her cargo or her crew, but the isolated personal negligent act of the petitioner's fellow longshoreman. To hold that this individual act of negligence ' rendered the ship unseaworthy would be to subvert the fundamental distinction between unseaworthiness and negligence that we have so painstakingly and repeatedly emphasized in our decisions. 400 U.S. at 496–500, 91 S.Ct. at 516–17 & 518, 27 L.Ed.2d 562 (footnotes omitted) (empasis added except final emphasis which appears in original).

Chief Judge Edward S. Northrop of this district has recently applied *Nacirema* and *Usner,* pointing out that these recent decisions circumscribe the liability of ships and their owners for injuries to longshoremen working on piers and not injured by ship-based equipment. In Sydnor v. Villain & Fassio e Compania Internazionale di Genova Societa Riunite di Navigazione, S.p.A., 323 F.Supp. 850 (D.Md. filed Feb. 23, 1971), Sydnor, a longshoreman, was injured on a pier. He was bending down to pick up some straps when he was struck in the back by a bale of rags. These rags were pushed over onto Sydnor by a tractor as it was transferring the bales on the pier in preparation for loading on the defendant vessel. Sydnor claimed the vessel was unseaworthy and negligent. In Diggs v. American Export Isbrandtsen

Lines, Inc., Civil No. 21557 (D.Md. filed Feb. 24, 1971), a longshoreman, Diggs, was injured while standing in a railroad boxcar positioned on a pier. Diggs' function was to stow cargo in a metal case that would be pulled from the boxcar by a cable attached to a tractor located on the pier and driven by a fellow longshoreman. The tractor driver, apparently negligently, and without notice, moved the tractor so that the cable wrapped around the plaintiff's leg and injured him. In neither *Sydnor* nor *Diggs* did the defendant raise the jurisdictional question per se. In *Sydnor*, the defendant filed a motion for summary judgment; in *Diggs*, the motion was to dismiss for failure to state a claim upon which relief could be granted. Relying primarily upon Nacirema Operating Co., Inc. v. Johnson, *supra*, Usner v. Luckenbach Overseas Corp., *supra*, and the apparent trend they have commenced, Judge Northrop granted defendant's motion in each case. Had defendants' motions been to dismiss for lack of admiralty tort jurisdiction, this court has no doubt that the result would have been the same—and correctly so!

No outline of recent cases would be complete without mention of the all-expansive holdings of certain inferior federal courts. Illustrative of such cases are Gebhard v. S. S. Hawaiian Legislator, *supra*; Chagois v. Lykes Bros. S. S. Co., 432 F.2d 388 (5th Cir. 1970), *petition for cert. filed*, 39 U.S.L.W. 3395 (U.S. Jan. 7, 1971); and Law v. Victory Carriers, Inc., 432 F.2d 376 (5th Cir. 1970), *cert. granted*, 401 U.S. 936, 91 S.Ct. 937, 28 L.Ed.2d 215 (1971). The general approach of these and similar all-expansive cases is that if someone who may be called a "longshoreman" is injured on a pier or in a pier-based structure, he should be allowed to recover from any vessel that happens to be berthed at the pier and the ship's owner. This "liability without theory" ignores the situs of the injury, ignores causation, ignores whether realistically the ship is being loaded or unloaded, and ignores the true status of the injured party. This court rejects such an approach as not in accord with the Supreme Court's most recent decisions.

Having concluded the outline of the "revolution" between 1940 and 1957, and of the continuing conflict since, a *caveat* is in order before proceeding to the resolution of each of the present controversies. It is directed at all who read this outline in the future. Written almost fifteen years ago by Professors Gilmore and Black, it is at least as timely today:

> Much of the present chapter is not much more than a progress report. So long as the volcano continues in eruption, no charts can be guaranteed reliable even until the next term of Court. Many of the old landmarks have disappeared for good. New ones have been tossed up, which may or may not be permanent additions to the map. The perils of the sea, which mariners suffer and shipowners insure against, have met their match in the perils of judicial review. The Law of Admiralty, *supra*, § 6–1.

## CONCLUSIONS

Paisley Green worked inside the second-story of the warehouse constructed on Pier 7. His job on the day he was injured was to "spot" palletized cargo that had been unloaded from the SS P & T Builder. He was hurt when he bent to pick up some fallen cases of cans and was struck by another case falling from the same pallet. Green's case went to trial, but no testimony was offered to explain why the cases of cans fell. No personnel from the ship were present at the accident.

Green alleges that his is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. He has made no allegation of any maritime contract. Therefore, it is clear that under the traditional rule Green's claim is without the admiralty tort jurisdiction because of the situs of his injury. Upon its understanding of the Supreme Court's most recent rulings, this court holds that it has no admiralty tort jurisdiction under

the Extension of Admiralty Jurisdiction Act. Green's injury was not "caused by a vessel on navigable waters." Realistically, the unloading of the SS P & T Builder had ended. Unlike *Gutierrez* no proof was offered to indicate that the cause of Green's injury emanated from the vessel. Accordingly, Green's libel is dismissed for want of jurisdiction. This makes its unnecessary to discuss other defenses asserted by the defendant.

■ William Randolph was working in a railroad gondola car positioned on a pier, alongside the SS Green Bay. He was injured while assisting in unloading steel drafts when the hook of a pier-based crane was suddenly dropped into the gondola car hurling him to the pier surface. The pier-based crane was operated by a fellow longshoreman, not a member of the ship's crew. The Maryland Port Authority, the owner of the pier and the crane, has moved to dismiss for lack of jurisdiction. As Randolph's is not an admiralty and maritime claim as he alleges, the Authority's motion is granted. No maritime contract is alleged and Randolph's claim is not within the admiralty tort jurisdiction of this court under either the traditional situs test or under the Extension of Admiralty Jurisdiction Act as interpreted in *Nacirema*. Therefore, Randolph's libel against the shipowner and crane operator is outside the admiralty jurisdiction of this court; it too is dismissed.

■ Bert Robinson was standing on Pier 8 helping land the pontoon hold covers of the SS Santa Olivia. While a pontoon was supported by the ship's boom, Robinson and his partner grasped it at either end. The other longshoreman walked forward; Robinson, backward. The pontoons were to be landed on chocks of wood, but just before Robinson got to the landing spot, he tripped over a small piece of wood which was much smaller than the chocks on which the pontoon was to be landed and which Robinson testified had nothing to do with the unloading operation. No evidence was offered as to the ownership of the piece of wood Robinson fell over

or its connection if any to the SS Santa Olivia. Nevertheless, Robinson contends his is an admiralty and maritime claim within the meaning of Rule 9(h). This court is unable to agree. The situs of Robinson's injury puts it outside the traditional bounds of admiralty tort jurisdiction. In the instant case, although there was a vessel on navigable waters, and although it was in the process of being unloaded, neither the vessel nor its gear nor adopted equipment caused the accident. Therefore, there is no admiralty tort jurisdiction under the Extension of Admiralty Jurisdiction Act. No maritime contract is alleged by Robinson. Accordingly, as his complaint is not within the admiralty and maritime jurisdiction of this court, it is dismissed. This makes it unnecessary to discuss Grace's defenses offered in its answer and at trial.

■ Oscar Eaddy was hurt doing work preparatory to the loading of the MS Anni Nubel. When Eaddy came to work on the morning of his accident, he found a palletized cargo of barrels. Unfortunately, many of the pallets supporting the cargo were not in good order, and it was Eaddy's job, along with another longshoreman, to assist in putting a good pallet supplied by Eaddy's employer, Robert C. Herd & Co., Inc., under any pallet thought to be too weak. Thereafter, Eaddy and his partner were responsible for seeing that the barrels were firmly on the pallets and placing a whiskey net over the barrels to hold them in place. Later, the pallets would be picked up by a forklift tractor which took pallets, one at a time, out under the MS Anni Nubel's cargo gear. Eaddy maintains that a forklift tractor brought a certain pallet to where he was working and that this pallet bore a barrel which protruded over the edge of the pallet. As the pallet seemed sufficiently strong, Eaddy began to place the barrel back securely on the pallet when the pallet broke causing three crowbars which were tied together and which were standing upright between the barrels to strike Eaddy and injure his left foot. Eaddy

does not know of any ship's officer being in the warehouse at the time of his injury. Undisputedly, Eaddy was injured inside the warehouse constructed on the pier at the Dundalk Marine Terminal.

This court holds that Eaddy's complaint is not within the admiralty and maritime jurisdiction of this court as he alleges. No maritime contract is asserted. As to admiralty tort jurisdiction, it is lacking under both the traditional situs rule and under the Extension of Admiralty Jurisdiction Act. Clearly, the loading of the MS Anni Nubel had not commenced at the time of Eaddy's injury. Just as clearly, his accident was not "caused by a vessel on navigable water." Accordingly, the court has no admiralty or maritime jurisdiction and the complaint is dismissed.

 James R. Miles was injured in the Western Maryland Railway grain elevator when he began to operate an electric starter motor used to run the No. 2, long, outshore conveyor-belt. Miles worked for Louis Dreyfus Corporation, the lessee of the grain elevator from Western Maryland Railway. Berthed adjacent to the grain elevator at Pier 2 was the SS Prodromos. The vessel had engaged the Jarka Corporation to load or unload its cargo. No allegation is made by Miles that any of the ship's personnel were present at the time of his accident. Nor is there any allegation that Miles was engaged in loading or unloading the vessel at the time of his injury, although he does assert that he was doing work in the ship's service in operating the motor. Miles claims that his causes of action against the vessel, its owner, and the Western Maryland Railway are within the admiralty and maritime jurisdiction of this court. From what has been said previously, it is obvious that Miles is mistaken in this view; therefore, his claims against these three defendants are dismissed. This leaves as the sole defendant, Westinghouse Electric Corporation, against which jurisdiction is said to be present based on diversity of citizenship of the parties and the requisite jurisdictional amount. Westinghouse is the alleged manufacturer of the motor in question. It has also filed a motion to dismiss. Westinghouse's motion is granted without prejudice to Miles' filing an amended complaint doing correctly what he failed to do here; namely, make proper allegations of diversity of citizenship and amount in controversy, as required by 28 U.S.C. § 1332, see Form 2, Fed. R.Civ.P.

Accordingly, the libels in Admiralty Nos. 4809 and 4997, and the complaints in Civil Nos. 18189, 18220, and 19814 are dismissed. It is so ordered.