## NACIREMA OPERATING CO., INC., ET AL. *v.* JOHNSON ET AL.

No. 9.  Argued March 25, 1969—Reargued October 20, 1969—Decided December 9, 1969*

*Randall C. Coleman* argued the cause for petitioners in No. 9 on the original argument and on the reargument. With him on the briefs was *William B. Eley.* *Solicitor General Griswold* argued the cause for petitioners in No. 16 on the original argument and on the reargument. With him on the brief were *Assistant Attorney General Ruckelshaus* and *Lawrence G. Wallace.*

*John J. O'Connor, Jr.,* argued the cause and filed briefs for respondents Johnson et al. on the original argument

---

*Together with No. 16, *Traynor et al., Deputy Commissioners* v. *Johnson et al.,* also on certiorari to the same court.

and on the reargument in both cases.   *Ralph Rabinowitz*
argued the cause and filed a brief for respondent Avery
on the original argument and on the reargument in both
cases.

*E. D. Vickery, Francis A. Scanlan, Scott H. Elder,* and
*J. Stewart Harrison* filed a brief for the National Mari-
time Compensation Committee as *amicus·curiae* urging
reversal in both cases.

Briefs of *amici curiae* urging affirmance in both cases
were filed by *Louis Waldman* and *Seymour M. Waldman*
for the International Longshoremen's Association, AFL–
CIO, and by *Paul S. Edelman* for the American Trial
Lawyers Association.

MR. JUSTICE WHITE delivered the opinion of the Court.

The single question of statutory construction presented
by these cases is whether injuries to longshoremen occur-
ring on piers permanently affixed to shore are compen-
sable under the Longshoremen's and Harbor Workers'
Compensation Act of 1927 (Longshoremen's Act), 44
Stat. 1424, 33 U. S. C. §§ 901–950.

Johnson and Klosek were employed by the Nacirema
Operating Company as longshoremen; Avery was sim-
ilarly employed by the Old Dominion Stevedoring Cor-
poration.   All three men were engaged at the time of
their accidents in performing similar operations as
"slingers," attaching cargo from railroad cars located on
piers [1] to ships' cranes for removal to the ships.   Klosek
was killed, and each of the other men was injured, when
cargo hoisted by the ship's crane swung back and knocked
him to the pier or crushed him against the side of the

---

[1] The piers involved extended from shore into the Patapsco
River at Sparrows Point, Maryland, and into the Elizabeth River
at Norfolk, Virginia.

railroad car. Deputy Commisioners of the United States Department of Labor denied claims for compensation in each case on the ground that the injuries had not occurred "upon the navigable waters of the United States" as required by the Act.[2] The District Courts upheld the Deputy Commissioners' decisions. 243 F. Supp. 184 (D. C. Md. 1965); 245 F. Supp. 51 (D. C. E. D. Va. 1965). The Court of Appeals for the Fourth Circuit, sitting *en banc,* reversed.[3] 398 F. 2d 900 (1968). We granted certiorari, 393 U. S. 976 (1968), to resolve the resulting conflict with decisions in other circuits holding that pier injuries are not covered by the Act.[4] We have concluded from an examination of the language, purpose, and legislative history of the Act, as well as prior decisions of this Court, that the judgment of the Court of Appeals must be reversed.

Since long before the Longshoremen's Act was passed, it has been settled law that structures such as wharves

---

[2] § 3 (a) of the Act, 33 U. S. C. § 903 (a), provides in relevant part:

"(a) Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any dry dock) and if recovery for the disability or death through workmen's compensation proceedings may not validly be provided by State law. . . ."

[3] The three cases were consolidated on appeal. In a fourth case, an award to a longshoreman who had drowned after being knocked off a pier into the water was affirmed by the District Court and the Court of Appeals. *Marine Stevedoring Corp.* v. *Oosting,* 238 F. Supp. 78 (D. C. E. D. Va. 1965).

[4] *Nicholson* v. *Calbeck,* 385 F. 2d 221 (C. A. 5th Cir. 1967), cert. denied, 389 U. S. 1051 (1968); *Houser* v. *O'Leary,* 383 F. 2d 730 (C. A. 9th Cir. 1967), cert. denied, 390 U. S. 954 (1968); *Travelers Insurance Co.* v. *Shea,* 382 F. 2d 344 (C. A. 5th Cir. 1967), cert. denied *sub nom. McCollough* v. *Travelers Insurance Co.,* 389 U. S. 1050 (1968); *Michigan Mutual Liability Co.* v. *Arrien,* 344 F. 2d 640 (C. A. 2d Cir.), cert. denied, 382 U. S. 835 (1965).

and piers, permanently affixed to land, are extensions of the land.[5] Thus, literally read, a statute that covers injuries "upon the navigable waters" would not cover injuries on a pier even though the pier, like a bridge, extends over navigable waters.[6]

Respondents urge, however, that the 1927 Act, though it employs language that determines coverage by the "situs" of the injury, was nevertheless aimed at broader coverage: coverage of the "status" of the longshoreman employed in performing a maritime contract. We do not agree. Congress might have extended coverage to all longshoremen by exercising its power over maritime contracts.[7] But the language of the Act is to the con-

---

[5] *Swanson* v. *Marra Bros., Inc.*, 328 U. S. 1 (1946); *Minnie* v. *Port Huron Terminal Co.*, 295 U. S. 647 (1935); *T. Smith & Son, Inc.* v. *Taylor*, 276 U. S. 179 (1928); *State Industrial Commission* v. *Nordenholt Corp.*, 259 U. S. 263 (1922); *Cleveland Terminal & Valley R. Co.* v. *Cleveland S. S. Co.*, 208 U. S. 316 (1908); *The Plymouth*, 3 Wall. 20 (1866); 1 E. Benedict, The Law of American Admiralty §§ 28, 29 (6th ed. 1940); G. Gilmore & C. Black, The Law of Admiralty §§ 6–46, 7–17 (1957); G. Robinson, Handbook of Admiralty Law in the United States § 11 (1939).

[6] We reject the alternative holding of the Court of Appeals that all injuries on these piers, despite settled doctrine to the contrary, may now be considered injuries on navigable waters—a proposition rejected implicitly by a unanimous Court just last Term. See *Rodrigue* v. *Aetna Casualty Co.*, 395 U. S. 352, 360, 366 (1969). Piers, like bridges, are not transformed from land structures into floating structures by the mere fact that vessels may pass beneath them.

[7] The admiralty jurisdiction in tort was traditionally "bounded by locality," *De Lovio* v. *Boit*, 7 F. Cas. 418, 444 (No. 3776) (C. C. D. Mass. 1815) (Story, J.) (followed in *Insurance Co.* v. *Dunham*, 11 Wall. 1 (1871)), encompassing all torts that took place on navigable waters. By contrast, admiralty contract jurisdiction "extends over all contracts, (wheresoever they may be made or executed, or whatsoever may be the form of the stipulations,) which relate to the navigation, business or commerce of the sea." *De Lovio* v. *Boit, supra*, at 444. Since a workmen's compensation act com-

trary and the background of the statute leaves little doubt that Congress' concern in providing compensation was a narrower one.

Ten years before the Act was passed this Court in *Southern Pacific Co.* v. *Jensen*, 244 U. S. 205 (1917), held that a State was without power to extend a compensation remedy to a longshoreman injured on the gangplank between the ship and the pier. The decision left longshoremen injured on the seaward side of the pier without a compensation remedy, while longshoremen injured on the pier enjoyed the protection of state compensation acts. *State Industrial Commission* v. *Nordenholt Corp.*, 259 U. S. 263 (1922).

Twice Congress attempted to fill this gap by passing legislation that would have extended state compensation remedies beyond the line drawn in *Jensen*.[8] Each time, this Court struck down the statute as an unlawful delegation of congressional power. *Washington* v. *Dawson & Co.*, 264 U. S. 219 (1924); *Knickerbocker Ice Co.* v. *Stewart*, 253 U. S. 149 (1920). Finally, responding to this Court's suggestion that what Congress could not empower the States to do, it could do itself,[9] Congress passed the Longshoremen's Act. The clear implication is that in enacting its own compensation statute, Con-

bines elements of both tort and contract, Congress need not have tested coverage by locality alone. As the text indicates, however, the history of the Act shows that Congress did indeed do just that.

[8] Act of October 6, 1917, 40 Stat. 395; Act of June 10, 1922, 42 Stat. 634.

[9] *Washington* v. *Dawson & Co.*, 264 U. S. 219, 227 (1924). The passage from *Dawson & Co.* was referred to in the hearings in both the Senate and the House. See Hearings on S. 3170 before a Subcommittee of the Senate Committee on the Judiciary, 69th Cong., 1st Sess., 18, 31, 103 and n. 3 (1926) (hereinafter "Senate Hearings"); Hearing on H. R. 9498 before the House Committee on the Judiciary, 69th Cong., 1st Sess., ser. 16, pp. 18, 119 and n. 3 (1926) (hereinafter "House Hearing").

gress was trying to do what it had failed to do in earlier attempts: to extend a compensation remedy to workmen injured beyond the pier and hence beyond the jurisdiction of the States. This purpose was clearly expressed in the language limiting coverage to injuries occurring "upon the navigable waters," and permitting recovery only "if recovery . . . through workmen's compensation proceedings may not validly be provided by State law." [10]

This conclusion is fully supported by the legislative history. As originally drafted, § 3 extended coverage to injuries "on a place within the admiralty jurisdiction of the United States, except employment of local concern and of no direct relation to navigation and commerce." [11] During the hearings, it was repeatedly emphasized and apparently assumed by representatives from both the shipping industry and the unions that a "place within the admiralty jurisdiction" did not include a dock or pier.[12] In fact, a representative of the Labor Depart-

---

[10] Drydocks were conceded to be within the admiralty jurisdiction in both the hearings and the debates, even though such structures are not always floating structures. See House Hearing 34; 68 Cong. Rec. 5403 (1927). If Congress had thought the words "upon the navigable waters" were broad enough to embrace the limits of admiralty jurisdiction, there would have been no need to add the parenthetical "(including any dry dock)."

[11] See Senate Hearings 2.

[12] Mr. Dempsey, representing the International Longshoremen's Association, testified that the bill would cover injuries on the dock as well as on the ship. When pressed as to how injuries on the dock could come within the admiralty jurisdiction, he confessed he did not understand the legal theory, and would defer to the longshoremen's attorney, Mr. Austin. Mr. Austin proceeded to testify: that the dock was not within the admiralty jurisdiction; that injuries on the dock were compensable under state law; that the problem arose because the longshoreman was left "high and dry" once he left the State's jurisdiction and stepped on the gangplank; and that "[t]hat is the gap that we are trying to fill . . . ." Senate Hearings 28, 30–31. Testimony that longshoremen injured on the docks would

ment objected to the bill precisely for that reason, urging the Committee to extend coverage to embrace the contract, "and not the man simply when he is on the ship." [13] If Congress had intended to adopt that suggestion, it could not have chosen a more inappropriate way of expressing its intent than by substituting the words "upon the navigable waters" for the words "within the admiralty jurisdiction." [14]   Indeed, the Senate Report that accompanied the revised bill, containing the language of the present Act, makes clear that the suggestion was rejected, rather than adopted: "[I]njuries occurring in

not be covered by the Act also came from representatives of the shipbuilders.  See Senate Hearings 58, 95, 103.  See also n. 15, *infra;* Hearing on S. 3170 before the House Committee on the Judiciary, 69th Cong., 1st Sess., ser. 16, pt. 2, pp. 141, 157 (1926) (testimony on the revised bill, containing the language of the present § 3).

[13] Senate Hearings 40.

[14] While the reason for the change in the language concerning the bill's coverage is not expressly indicated, it appears to have been a response to objections that the original language, carving out an exception for employment of "local concern," was too vague to define clearly the line being drawn, and might even encounter problems once again at the hands of this Court.  See Senate Hearings 56–57, 95;  House Hearing 77, 100.  In fact, the same spokesman for the shipbuilders who objected to the vagueness of the "local concern" exception, also objected that the bill as written might "upset all the present arrangements with respect to compensating men on the dock."  Senate Hearings 57.  The implication is that no one expected the federal law to extend into the area of the State's jurisdiction on the dock, but that confusion existed as to whether, conversely, state remedies would be exclusive as to injuries "on navigable waters" but within the "maritime but local" exception created by *Grant Smith-Porter Ship Co.* v. *Rohde,* 257 U. S. 469 (1922).  This reading of the legislative history was adopted in *Calbeck* v. *Travelers Insurance Co.,* 370 U. S. 114, 121–127 (1962), where the Court concluded that the Act did not prevent recovery for injuries on navigable waters, even though a state remedy would also have been available under *Rohde.*

loading or unloading are not covered unless they occur on the ship or between the wharf and the ship so as to bring them within the maritime jurisdiction of the United States." S. Rep. No. 973, 69th Cong., 1st Sess., 16. We decline to ignore these explicit indications of a design to provide compensation only beyond the pier where the States could not reach. "That is the gap that we are trying to fill." [15] In filling that gap Congress did not extend coverage to longshoremen like those respondents whose injuries occurred on the landward side of the *Jensen* line,

---

[15] See n. 12, *supra.* Other indications that Congress had no intention of replacing or overlapping state compensation remedies for dockside injuries can be found throughout the hearings. At one point, in attempting to calculate the increased costs involved in the federal Act, Senator Cummins, Chairman of the Committee, pointed out that "we are proceeding on the theory that these people can not be compensated under the New York compensation law or any other compensation law." "[T]he purpose of this law," he agreed with a witness, was simply to cover the men who "are going to be exposed a part of the time on board vessels . . . and therefore will have to be compensated in some other way where the New York law is not the remedy available." Senate Hearings 84–85. Similarly, Representative Graham, Chairman of the House Committee, agreed that "the real necessity for this legislation" was to provide workers with compensation when they stepped from dock to ship. House Hearing 25. In fact, the labor representative who was testifying at that point in the hearing insisted that the legislation sought was only for "[t]hose who are injured on board vessels at the dock." Those injured on the dock "are taken care of under the State law." *Id.,* at 28. There was also testimony by a longshoremen's representative that "65 per cent of the accidents in the courts of New York happen on board ships or on gangplanks; . . . therefore . . . 65 per cent of the accidents of the men who are injured by performing this work will be compensable under this bill." *Id.,* at 35. See also *id.,* at 44. Another noted that "our men that are working on the dock are protected, and well protected, under the New York compensation act, but our men on board ship are not protected. We feel that Congress wants to protect them . . . ." Senate Hearings 42.

clearly entitling them to protection under state compensation Acts.[16]

Decisions of this Court have more than once embraced this interpretation. *Swanson* v. *Marra Bros., Inc.,* 328 U. S. 1 (1946), held that neither the Jones Act nor the Longshoremen's Act covered a longshoreman injured on the dock in the course of his employment even if the injury was caused by a vessel on navigable waters. *Parker* v. *Motor Boat Sales,* 314 U. S. 244, 249 (1941), concluded that the purpose of the Act "was to provide for federal compensation in the area which the specific decisions referred to placed beyond the reach of the states." *Davis* v. *Dept. of Labor & Industries,* 317 U. S. 249, 256 (1942), noted that in passing the Longshoremen's Act, Congress had specifically adopted the *Jensen* line. The interpretation endorsed by these cases is also reflected in a consistent course of administrative construction commencing immediately after the enactment of the Act. Employees' Compensation Commission Opinions Nos. 5 and 16, 1927 A. M. C. 1558 and 1855; No. 30, 1928 A. M. C. 417.

It is true that since *Jensen* this Court has permitted recovery under state remedies in particular situations seaward of the pier, *Parker* v. *Motor Boat Sales, supra,* and in *Calbeck* v. *Travelers Insurance Co.,* 370 U. S. 114 (1962), approved recovery under the Longshoremen's Act for injuries occurring on navigable waters which might also have been compensable under state law. *Calbeck* made it clear that Congress intended to exercise its full jurisdiction seaward of the *Jensen* line

---

[16] Both Johnson and Klosek's widow and minor children have filed claims, and are concededly entitled to benefits, under the Maryland Workmen's Compensation Act. Avery has already been awarded benefits under the Virginia Workmen's Compensation Law.

and to cover all injuries on navigable waters, whether or not state compensation was also available in particular situations. The proviso to § 3 (a) conditioning coverage on the unavailability of state remedies was not meant to deny federal relief where the injury occurred on navigable waters. But removing uncertainties as to the Act's coverage of injuries occurring on navigable waters is a far cry from construing the Act to reach injuries on land traditionally within the ambit of state compensation acts.

Indeed, *Calbeck* freely cited the *Parker* and *Davis* declarations that the Longshoremen's Act adopted the *Jensen* line, and *Calbeck*'s holding rejected the notion that the line should advance or recede simply because decisions of this Court had permitted state remedies in narrow areas seaward of that line. Otherwise, the reach of the federal Act would be subject to uncertainty, and its coverage would "expand and recede in harness with developments in constitutional interpretation as to the scope of state power to compensate injuries on navigable waters," with the result "that every litigation raising an issue of federal coverage would raise an issue of constitutional dimension, with all that that implies . . . ." 370 U. S., at 126. As in *Calbeck*, we refuse to impute to Congress the intent of burdening the administration of compensation by perpetuating such confusion.

Nor can we agree that what Congress did not do in 1927, it did in 1948 when it passed the Extension of Admiralty Jurisdiction Act (Extension Act), 62 Stat. 496, 46 U. S. C. § 740. In pertinent part, that Act provides:

> "The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused

by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land."

By its very choice of language, the Act re-enforces the conclusion that Congress was well aware of the distinction between land injuries and water injuries and that when it limited recovery to injuries on navigable waters, it did not mean injuries on land. The Act no doubt extended the admiralty tort jurisdiction to ship-caused injuries on a pier. But far from modifying the clear understanding in the law that a pier was an extension of land and that a pier injury was not on navigable waters but on land, the Act accepts that rule and nevertheless declares such injuries to be maritime torts if caused by a vessel on navigable waters.

The Extension Act was passed to remedy the completely different problem that arose from the fact that parties aggrieved by injuries done by ships to bridges, docks, and the like could not get into admiralty at all. [17] There is no evidence that Congress thereby intended to amend or affect the coverage of the Longshoremen's Act or to overrule *Swanson* v. *Marra Bros.,* *supra,* decided just two years earlier.[18] While the Exten-

---

[17] See Gilmore & Black, *supra,* n. 5, § 7–17.

[18] The legislative history of the Extension Act is devoid of any reference to the Longshoremen's Act, as might well be expected in an Act dealing with a wholly unrelated problem. See S. Rep. No. 1593, 80th Cong., 2d Sess. (1948); H. R. Rep. No. 1523, 80th Cong., 2d Sess. (1948).

The House Report accompanying the Extension Act notes that "the bill will not create new causes of action," *id.,* at 3, and the statute speaks of extending jurisdiction to suits "in rem or in personam" for "damage" to "person or property"—concepts wholly at odds with the theory of workmen's compensation—awards made in an administrative proceeding. The conclusion of the District Court

sion Act may have the effect of permitting respondents to maintain an otherwise unavailable libel in admiralty,[19] see *Gutierrez* v. *Waterman S. S. Corp.*, 373 U. S. 206 (1963), the Act has no bearing whatsoever on their right to a compensation remedy under the Longshoremen's Act.

There is much to be said for uniform treatment of longshoremen injured while loading or unloading a ship. But even construing the Extension Act to amend the Longshoremen's Act would not effect this result, since longshoremen injured on a pier by pier-based equipment would still remain outside the Act. And construing the Longshoremen's Act to coincide with the limits of admiralty jurisdiction—whatever they may be and however they may change—simply replaces one line with another whose uncertain contours can only perpetuate on the landward side of the *Jensen* line, the same confusion that previously existed on the seaward side. While we have no doubt that Congress had the power to choose either of these paths in defining the coverage of its

---

is inescapable. "The two statutes do not deal with the same subject matter, are inherently inconsistent with each other, and cannot be read as being in pari materia." 243 F. Supp. 184, 194 (1965).

It is worth noting that a contemporaneous amendment of the Longshoremen's Act contains no cross reference to the Extension Act. See Act of June 24, 1948, 62 Stat. 602 (a bill to increase benefits under the Longshoremen's Act, passed five days after the Extension Act). And, a House Report dated July 28, 1958—10 years after enactment of the Extension Act—points out that employees "on the navigable waters of the United States" are covered under the Longshoremen's Act, but are under state protection "when performing work on docks and in other shore areas." H. R. Rep. No. 2287, 85th Cong., 2d Sess., 2 (accompanying a bill to provide safety programs for longshoremen).

[19] We were informed in argument that two of the parties have in fact already commenced actions against the shipowner.

compensation remedy, the plain fact is that it chose instead the line in *Jensen* separating water from land at the edge of the pier. The invitation to move that line landward must be addressed to Congress, not to this Court.

*Reversed.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK and MR. JUSTICE BRENNAN concur, dissenting.

We dissent for the reasons stated by Judge Soboloff speaking for the Court of Appeals sitting *en banc*. 398 F. 2d 900. As he says, the Longshoremen's and Harbor Workers' Compensation Act is not restricted to conventional "admiralty tort jurisdiction" but is "status oriented, reaching all injuries sustained by longshoremen in the course of their employment." *Id.,* at 904. The matter should be at rest after *Calbeck* v. *Travelers Insurance Co.,* 370 U. S. 114. In that suit under this Act we said that " 'Congress intended the compensation act to have a coverage co-extensive with the limits of its authority.' " *Id.,* at 130, quoting from *De Bardeleben Coal Corp.* v. *Henderson,* 142 F. 2d 481, 483. Judge Soboloff in the instant cases, while answering the argument that *Calbeck* was not concerned with the meaning of "upon the navigable waters," referred to Judge Palmieri's opinion in *Michigan Mutual Liability Co.* v. *Arrien,* 233 F. Supp. 496, 500, aff'd, 344 F. 2d 640:

> "What is just as important as the actual holding in Calbeck is the general approach to the [Longshoremen's Compensation] Act taken by the Court. No longer is the Act viewed as merely filling in the interstices around the shore line of the state acts, but rather as an affirmative exercise of admiralty jurisdiction."

Judge Sobeloff went on to say:

"This affirmative exercise of the admiralty power of Congress 'to the fullest extent' of its jurisdiction, creating 'a coverage co-extensive with the limits of its authority,' can only mean that Congress effectively enacted a law to protect all who could constitutionally be brought within the ambit of its maritime authority. Again, in the words of Judge Palmieri, 'it thus appears that "upon navigable waters" is to be equated with "admiralty jurisdiction." ' " 398 F. 2d, at 905.

In addition to the cases being reviewed here, the Court of Appeals affirmed a judgment in favor of the widow of a longshoreman (238 F. Supp. 78), who, while working on the pier, was struck by a cable and knocked into the water where he died. It is incongruous to us that in an accident on a pier over navigable waters coverage of the Act depends on where the body falls after the accident has happened. For this and the other reasons stated by Judge Sobeloff, we dissent from a reversal of these judgments.