908 F.2d 1434
 59 USLW 2083
 SAIF CORPORATION/OREGON SHIP, Petitioners,
v.
Grover JOHNSON, Claimant-Respondent,
and
Director, Office of Workers' Compensation Programs, United
States Department of Labor, Respondent.
 No. 89-70412.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 6, 1990.
Decided July 13, 1990.
 
 David L. Runner, Asst. Atty. Gen., Salem, Or., for petitioners.
 Robert K. Udziela, Pozzi, Wilson, Atchison, O'Leary & Conboy, Portland, Or., for claimant-respondent.
 Samuel J. Oshinsky, U.S. Dept. of Labor, Washington, D.C., for Director, Office of Workers' Compensation Programs.
 Appeal from the Decision and Order of the Benefits Review Board.
 Before SCHROEDER, NORRIS and WIGGINS, Circuit Judges.
 SCHROEDER, Circuit Judge:
 
 
 1
 This is a petition to review a decision of the Benefits Review Board in favor of the claimant in a Longshoremen's and Harbor Workers' Compensation Act ("LHWCA") proceeding. The claimant was unquestionably exposed to asbestos in 1942 while constructing ships for petitioner Oregon Shipbuilding Corporation ("Oregon"). The exposure occurred while he worked on a ship building way. Saif Corporation ("Saif"), also a petitioner here, is Oregon's workers' compensation carrier. The asbestosis was manifest in 1980 when it disabled the claimant, and the Board awarded the claimant 40% disability benefits.
 
 
 2
 We must decide three principal issues. The first is whether the Board correctly held that the law as it existed prior to 1972 covered work done on a building way, which is a structure used to construct new ships. The statute as it read in 1942, provided coverage only if the disability resulted from an injury occurring "upon the navigable waters of the United States (including any dry dock)." LHWCA, ch. 509, Sec. 3, 44 Stat. 1426 (1927) (current version at 33 U.S.C. Sec. 903 (Supp. V 1987)). Because a building way is not located on navigable waters, and is not in the nature of a dry dock, we hold that the Board did err in holding that the pre-1972 law covered work done on a building way. See O'Leary v. Puget Sound Bridge & Dry Dock, 349 F.2d 571 (9th Cir.1965).
 
 
 3
 The Act was amended in 1976, however, to provide coverage for persons working on building ways, and we therefore consider the claimant's alternative contention that it is the post-amendment law that applies. We hold that the 1976 amendment does apply under the rationale of Todd Shipyards Corp. v. Black, 717 F.2d 1280 (9th Cir.1983), cert. denied, 466 U.S. 937, 104 S.Ct. 1910, 80 L.Ed.2d 459 (1984), which holds that the "time of injury" in a related section of the same statute must be measured as of the time the asbestosis manifested itself by disabling the claimant and not the time of last exposure to asbestos.
 
 
 4
 Petitioners also challenge the Board's invocation of the "aggravation rule" to award damages to Johnson based upon the totality of his disability, even though some was due to his long-term cigarette habit. We affirm the award.
 
 Facts
 
 5
 Grover Johnson, the claimant here, worked as a brick mason helper for his employer, Oregon, from December 8, 1941 through the middle of 1942. Johnson was employed to help construct new ships on building ways near the Willamette River. There he was exposed to airborne asbestos fibers.
 
 
 6
 After working for Oregon Shipbuilding Corporation, Johnson worked briefly for another shipbuilder, went into the military, and following his service, worked as a meat cutter until his retirement in October 1979. Johnson's only exposure to asbestos occurred with Oregon.
 
 
 7
 Johnson is also a smoker, having begun at the age of 13 in 1933. In April 1979, Johnson contracted pneumonia and was treated by a pulmonary specialist, Dr. Burke. At this time, in 1979, testing revealed a moderate obstructive defect and a mild restrictive defect. The obstructive defect was due to Johnson's cigarette smoking, and the restrictive defect was diagnosed as due to asbestosis. Sometime after October 13, 1980, Johnson became disabled as a result of the combination of these defects.
 
 
 8
 Johnson brought this claim which was heard by an ALJ who rendered an opinion on September 4, 1986. The Board upheld this decision, applying pre-1972 law to conclude that Johnson's work for Oregon was compensable and that Johnson suffered 40% permanent disability. The Board upheld the ALJ's award for the entire impairment regardless of the effect of the smoking. This award was based upon the "aggravation rule" which holds that "if the employment-related injury combines with, contributes to or aggravates a pre-existing or underlying condition, the entire disability is compensable and the relative contributions are not weighed." Wheatley v. Adler, 407 F.2d 307 (D.C.Cir.1968); Independent Stevedore Co. v. O'Leary, 357 F.2d 812 (9th Cir.1966).
 
 Coverage Under Pre-1976 Law
 
 9
 It is undisputed that Johnson's work for Oregon occurred on building ways. Building ways are permanent shipyard structures which are located entirely on land and are designed and used exclusively for new ship construction. After construction on a ship is completed, blocks holding the ship in place are removed and the ship slides down wooden beams which extend into the water. Once launched, a ship cannot be returned to the building way.
 
 
 10
 Before the Longshoremen and Harbor Workers Act was amended in 1976, section 3(a) provided coverage "only if the disability ... results from an injury occurring upon the navigable waters of the United States (including any dry dock)...." LHWCA, ch. 509, Sec. 3, 44 Stat. 1426 (1927). In O'Leary v. Puget Sound Bridge & Dry Dock, 349 F.2d 571 (9th Cir.1965), this court held that injuries arising on building ways were not covered under the Act as it then was written.
 
 
 11
 In O'Leary, the claimant was injured when a piece of lumber struck him as he was working on a building way. Since he was not injured upon the navigable waters of the United States, he was forced to argue that a building way was a type of dry dock included within the Act. This court disagreed. Building ways, we held, have traditionally been distinguished from the three types of dry docks: floating dry docks, graving docks and marine railways. Id. at 573; see Avondale Marine Ways v. Henderson, 346 U.S. 366, 74 S.Ct. 100, 98 L.Ed. 77 (1953) (marine railway included in definition of dry dock). We pointed out that the distinction between dry docks and building ways was a traditional one and there was "nothing in the legislative history of the Act to indicate that the Congress intended to include a building way on which a new ship was under construction within the meaning of the phrase 'any dry dock.' " Id. at 573-74.
 
 
 12
 In its decision in this case, the Board followed its own cases holding that work on land-based building ways is work on a "dry dock" pursuant to section 3(a) of the pre-1972 amendment Act. The Board rejected the applicability of O'Leary, holding that it had been overruled sub silentio by the Supreme Court's opinion in Calbeck v. Travellers' Insurance Co., 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed.2d 368 (1962). Saif and the Director of the Office of Workers' Compensation Programs argue that the Board misread the applicable cases.
 
 
 13
 The issue is whether the Supreme Court's decision in Calbeck effectively overruled our decision in O'Leary. In Calbeck, the two employees who sued under the Act had both indisputably been injured upon navigable waters. One employee had been injured while working on an incomplete drilling barge which had been launched and was floating on the Sabine River, and the other claimant was injured while welding on an oil drilling barge which had been launched and was floating on the navigable waters of the Mississippi River. Calbeck, 370 U.S. at 115 n. 2, 82 S.Ct. at 1197 n. 2. It was clear that the state could constitutionally have provided compensation for those employees. See Grant Smith-Porter Ship Co. v. Rohde, 257 U.S. 469, 42 S.Ct. 157, 66 L.Ed. 321 (1922). The employers and their compensation carriers in Calbeck argued that a provision in the Act as it then read, which allowed recovery only if compensation for the disability or death could "not validly be provided by state law," id. 370 U.S. at 114 n. 1, 82 S.Ct. at 1197 n. 1 (quoting 33 U.S.C. Sec. 903(a) (1927)), precluded an award under the LHWCA. The Supreme Court disagreed and held that Congress had not intended the phrase in question to limit recovery. Instead, "Congress invoked its constitutional power so as to provide compensation for all injuries sustained by employees on navigable waters whether or not a particular injury might also have been within the constitutional reach of a state workmen's compensation law." Calbeck, 370 U.S. at 117, 82 S.Ct. at 1198. Here the Board reasoned that Calbeck extended coverage to new ship construction because it made clear that matters previously held to be of "local concern" to states, namely new ship construction, were not precluded from coverage under the Act.
 
 
 14
 While it may be true that Congress could extend coverage, the Supreme Court in Calbeck did not eliminate the requirement that the claimant be injured on a covered situs. In Richard A. Paul v. General Dynamics Corp., 16 BRBS 290 (1984), cited as support for the decision here, the Board recognized this:
 
 
 15
 After Calbeck, the distinction between new ship construction, traditionally an area of state jurisdiction, and repair of existing vessels, traditionally a matter of federal concern, is no longer valid. As a result, the pre-amendment Longshore Act covers an employee injured in new ship construction provided that the injury occurred "upon navigable waters of the United States (including any dry dock)."
 
 
 16
 Id. at 292 (emphasis added). The Paul reading of Calbeck is correct. Contrary to the reading the Board makes here, the Supreme Court in Calbeck did not eliminate the requirement that the injuries have occurred upon the "navigable waters (including any dry dock)." See Director, O.W.C.P. v. Perini North River Associates, 459 U.S. 297, 316, 103 S.Ct. 634, 646, 74 L.Ed.2d 465 (1983) ("Despite the fact that Calbeck extended protection of the LHWCA to all employees injured upon navigable waters in the course of their employment, LHWCA coverage still stopped at the water's edge--a line of demarcation established by Jensen."). Nor did the Court expand the definition of dry dock to include building ways.
 
 
 17
 The scope of the Act's coverage was the subject of subsequent court consideration in Nacirema Operating Co. v. Johnson, 396 U.S. 212, 90 S.Ct. 347, 24 L.Ed.2d 371 (1969). In Nacirema, the Court reaffirmed a narrow reading of the phrase "upon the navigable waters" and held that injuries to longshoremen that arose while they worked on piers permanently affixed to shore are not compensable under the LHWCA. In Nacirema, the Court held:
 
 
 18
 By its very choice of language, the Act reinforces the conclusion that Congress was well aware of the distinction between land injuries and water injuries and that when it limited recovery to injuries on navigable waters, it did not mean injuries on land.
 
 
 19
 Id. at 222, 90 S.Ct. at 353.
 
 
 20
 The bright-line distinction between "land injuries" and "navigable water injuries," in Nacirema was not new. It was first made in Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917), and retained by the Court in Nacirema. It had become known as the "Jensen line," marking the difference between land and navigable water. Seaward of that line coverage exists under the Act. This line traditionally did not include a dock or pier, which "like bridges, are not transformed from land structures into floating structures by the mere fact that vessels may pass beneath them." Nacirema, 396 U.S. at 215 n. 6, 90 S.Ct. at 350 n. 6. Thus, Calbeck, where the two employees were injured over navigable water, is irrelevant to this court's holding in O'Leary where the injury did not occur on navigable water. Nacirema on the other hand, supports the O'Leary approach of looking to the traditional understandings of the phrases dry dock and building way. Here, it is uncontested that Johnson was working on land, and not over navigable waters or on a dry dock when he was injured. Therefore under O'Leary and consistent with Calbeck and Nacirema, the Act prior to the 1972 amendments did not cover him.
 
 
 21
 The other opinions cited by the Board and Johnson are not inconsistent with this conclusion, and most support it. In Kaiser Steel Corp. v. Director, OWCP, 812 F.2d 518 (9th Cir.1987), the claimant was injured while working on a "stationary, offshore oil platform under construction." Id. at 520. When we held there was coverage in that case, we were actually construing the Lands Act, 43 U.S.C. Sec. 1333(b), which extended the "scope of coverage provided by the Longshore Act to include certain employees injured in the course of their work on the [Outer Continental Shelf]." Id. at 520. This case does not involve an injury which occurred on the Outer Continental Shelf.
 
 
 22
 In St. Louis Shipbuilding v. Director, OWCP, 551 F.2d 1119 (5th Cir.1977), the court reversed a decision of the Benefits Review Board that found in favor of a claimant. There the Fifth Circuit suggested that if the claimant had been working on a "building way" he would not have been covered, but avoided characterizing the structure as a building way or a dry dock because there was no evidence that the logs holding up the tug boat upon which the claimant had been working were physically connected to the structure at issue. Id. at 1123-24.
 
 
 23
 In Travelers Ins. Co. v. Shea, 382 F.2d 344 (5th Cir.1967), cert. denied, 389 U.S. 1050, 88 S.Ct. 780, 19 L.Ed.2d 842 (1968), the court reversed an award where the claimant was injured while working on a floating outfitting pier because, while dry docks are included within the coverage of the Act, piers are not:
 
 
 24
 [I]t must be remembered that the coverage of the Longshoremen's Act is not keyed to function but is situs-oriented. We are not impressed by the fact that McCollough was injured when assisting in repairing a vessel. We are, however, very impressed by the undisputed evidence, which shows that the situs of the injury to McCollough was a permanently anchored structure which, once built, was an extension of the shore of the Sabine River.
 
 
 25
 Id. at 349.
 
 
 26
 In Gretna Machine and Ironworks, Inc. v. Neuman, 446 F.2d 550 (5th Cir.1971), the claimant/welder was injured inside a "shipbuilding dry dock." Id. at 552. On this basis, his award was affirmed. Similarly, in Simpson v. Director, OWCP, 681 F.2d 81 (1st Cir.1982), cert. denied, 459 U.S. 1127, 103 S.Ct. 762, 74 L.Ed.2d 977 (1983), the claimant was injured on a marine railway (a type of dry dock) and was therefore covered under the Act. Id. at 82.
 
 
 27
 In conclusion, there is no authority for the Board's position that a building way is a dry dock within the meaning of the statute. Johnson is not covered under the pre-1972 Act.
 
 Application of the 1972 Amendments
 
 28
 Foreseeing our conclusion that he was not covered under the pre-1972 Act, Johnson urges upon us an alternative contention which he also urged before the ALJ. Johnson argues that the applicable law is that which existed on the date he was disabled by the manifestation of his disease (1980), and not the law in effect on the date on which Johnson was exposed to the occupational hazard (1941-1942). We conclude this contention is correct.
 
 
 29
 In 1972, Congress amended the LHWCA and specifically placed within its coverage injuries occurring on any "building way." Section 3(a) of the Act, as amended in 1972, reads as follows:
 
 
 30
 Compensation shall be payable under this Act in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, termination, building way, marine railway, or other adjoining area customarily used by an employer in loading, repairing, or building a vessel ).
 
 
 31
 33 U.S.C. Sec. 903(a) (Supp. V 1987) (emphasis added).
 
 
 32
 Thus, the issue is whether Johnson was injured after the amendment. We must therefore interpret the word "injury" as it is used in the statute. If the injury occurred when he was exposed to the asbestos, we would apply pre-1972 law. On the other hand, if Johnson was injured when the manifestation of his asbestosis disabled him, he would stand to benefit from the 1972 amendments.
 
 
 33
 In Todd Shipyards Corp. v. Black, 717 F.2d 1280 (9th Cir.1983), cert. denied, 466 U.S. 937, 104 S.Ct. 1910, this court considered a similar issue in interpreting the phrase "time of injury" as used in a different section of the LHWCA. We held the "injury" occurred when "the occupational disease manifested itself through a loss of wage-earning capacity," id. at 1291, and not on the claimant's last date of exposure to the substance causing the disease.
 
 
 34
 In Black, we construed section 10 of the LHWCA which provided that "the average weekly wage of the injured employee at the time of injury shall be taken as the basis upon which to compute compensation." 33 U.S.C. Sec. 910 (1976) (emphasis supplied). In holding that compensation should be computed on the basis of the weekly wage at the time of disablement, this court was persuaded by three factors. First, "[t]he paramount goal of the LHWCA is to compensate workers for the loss of wage-earning capacity resulting from occupational injuries and diseases." Black, 717 F.2d at 1289 (citations omitted). We said in Black that the manifestation rule best comported with this goal because "the last exposure approach would compensate Black based on his 1944 weekly wage of $92.00 rather than on the earning capacity he was robbed of when the asbestosis struck in 1977." Id. This reasoning applies with even greater force in the instant case. If the manifestation rule is not applied here, workers like Johnson will remain entirely uncompensated, not simply undercompensated.
 
 
 35
 Second, we based our decision in Black upon "a realistic definition of the term 'injury,' " id., as applied to latent diseases like asbestosis. "Asbestosis begins when asbestos fibers become embedded in the lungs. The average person, however, would not consider himself injured merely because the fibers were embedded in his lungs." Id. As Johnson also suffers from asbestosis, this reasoning applies to him as well.
 
 
 36
 Finally, we found it persuasive in Black that, "[i]n cases of occupational diseases with long latency periods, the trend is clearly toward the application of the time of manifestation rule." Id. (citations omitted). We cited among other authorities, Eagle-Picher Indus. Inc. v. Liberty Mut. Ins. Co., 682 F.2d 12, 25 (1st Cir.1982), and Wilson v. Johns-Manville Sales Corp., 684 F.2d 111, 112 (D.C.Cir.1982). Congress has now codified Black with respect to a number of sections of the LHWCA, telling all courts to follow Black in applying the manifestation rule. This trend has therefore not subsided.
 
 
 37
 While Black held that the time of industrial disability controls where the issue was the amount of benefits, we have held such a rule does not apply in a different context, where the question was proper venue. In Bernardo v. Director, OWCP, 772 F.2d 576 (9th Cir.1985), we interpreted section 921(c) which provides that "any person aggrieved by a final order of the [benefit review] board may obtain a review of that order in the United States Court of Appeals for the circuit in which the injury occurred...."[1] In Bernardo, the claimant was exposed to coal dust in the Third Circuit but the disease manifested itself while he was living in the Ninth Circuit. This court transferred his petition for review to the Third Circuit, holding that his exposure in the Third Circuit constituted injury, and not the manifestation of that injury, which occurred in the Ninth Circuit.
 
 
 38
 Cognizant of the fact that a change of venue has no bearing on a claimant's ultimate recovery, this court in Bernardo explicitly distinguished Black by noting that "[t]hat case implicated different concerns and required a determination of congressional intent on policies not at issue in the instant case." Id. at 578 n. 3. As noted above, these "different concerns" to which Bernardo referred are very relevant here. This case is governed by the reasoning in Black rather than Bernardo.
 
 
 39
 The carrier contends that the rationale in this case should be different from the rationale in Black simply because we are here interpreting a section of the statute that is different from the section being interpreted in Black and that Congress has not amended section 903 since Black. The carrier points out that in 1984, Congress adopted the manifestation theory for the purposes of section 910 (compensation), and sections 912 and 913 (relating to statute of limitations), but Congress did not alter section 903(a), which is at issue here. We do not find this contention persuasive. The fact that Congress eliminated some ambiguities in the statute brought to light by an opinion of this court does not support the inference that Congress rejected such modification of other sections of the same statute where the problem was not evident. Cf. Sun Ship, Inc. v. Pennsylvania, 447 U.S. 715, 719-20, 726, 100 S.Ct. 2432, 2435-36, 2439, 65 L.Ed.2d 458 (1980). Quite to the contrary, we believe that Congress' subsequent codification of the Black decision by amendment of those sections following Black constitutes approval of our reasoning in that case. We should not ignore that reasoning, especially when we are faced with very similar problems, namely, the question of compensation to be awarded under the Act for the latent injury of asbestosis. For these reasons, in cases involving latent diseases under the LHWCA, we apply the law in effect at the time the disease's manifestation disables, and not the law at the time of last exposure.
 
 
 40
 Saif argues that even if post-1972 law is the appropriate one to apply in this case, Johnson has waived that argument because, although he presented this line of reasoning to the ALJ, he did not explicitly present the issue of the applicable law to the Board. The ALJ, of course, did not reach the issue, and the Board would not have needed to reach it either, since both decided the case in the claimant's favor on the basis of pre-1972 law.
 
 
 41
 To support its theory of waiver, Saif cites Perkins v. Marine Terminals Corp., 673 F.2d 1097, 1100 (9th Cir.1982) and Duncanson-Harrelson Co. v. Director, OWCP, 644 F.2d 827, 831-32 (9th Cir.1981). In those cases, however, we held that a decision should not be set aside on an issue which was raised for the first time on review. Here, we affirm the Board[2] on an issue which was raised before the ALJ and upon which a factual record was developed.
 
 
 42
 We recognize that the Court in Unemployment Compensation Comm'n v. Aragon, 329 U.S. 143, 67 S.Ct. 245, 91 L.Ed. 136 (1946), upon which Perkins and Duncanson relied, stressed the importance of exhaustion of administrative remedies. Id. at 155 & n. 15, 67 S.Ct. at 251 & n. 15; see Reid v. Engen, 765 F.2d 1457, 1460 (9th Cir.1985).[3] However, the analogy to a situation where further exhaustion of administrative remedies would be required fails. This court, along with every other circuit to consider the issue, has held that there is no exhaustion requirement if resort to the agency would be futile. 5 J. Stein, G. Mitchell & B. Mezines, Administrative Law Sec. 49.01 at 49-5 (1988 & 1990 Supp.); see, e.g., Ramon-Sepulveda v. INS, 824 F.2d 749, 751 (9th Cir.1987); Ahrens v. Bowen, 852 F.2d 49 (2d Cir.1988); Youghiogheny and Ohio Coal Co. v. Warren, 841 F.2d 134, 138 (6th Cir.1987). The Board's position on the issue in question appears already set. In Verderane v. Jacksonville Shipyards, Inc., 14 BRBS 220 (1981), the Benefits Review Board held unequivocally that the question of whether an occupational disease is covered under the LHWCA must be determined under the law in effect at the time of the exposure to the injurious stimuli. Thus, even if the Board in this case had considered the issue of applicable law, not only would its comments have been dicta (because the Board found coverage under pre-1972 law), but it is very likely what its result would have been. Under these peculiar circumstances it would have been futile for Johnson to raise the argument. See Youghiogheny, 841 F.2d at 138.
 
 
 43
 For these reasons Johnson is not precluded from raising before us the issue of the applicable law.
 
 Aggravation Rule
 
 44
 Even though Johnson's injuries were partially caused by cigarette smoking, the Board applied well established principles to affirm the ALJ and treat the entire condition as compensable. The Board cited its own precedent, Johnson v. Ingalls Shipbuilding Division, Litton Systems, Inc., 22 BRBS 160 (1989), as well as our decision in Independent Stevedore Co. v. O'Leary, 357 F.2d 812 (9th Cir.1966), for support. This doctrine of aggravation, which holds that the employer must fully compensate an employee whose occupational injury "aggravates" a pre-existing condition to produce disability is, according to the leading commentator, "sometimes expressed by saying that the employer takes the employee as he finds him." 1 A. Larson, Workmen's Compensation Law Sec. 12.21 at 3-381, 3-433 (1990).
 
 
 45
 Saif argues that the aggravation rule is inappropriate in this case and makes two arguments for its position. Saif's first ground is that the aggravation rule should not apply to retired workers, because the sole purpose of the rule is rehabilitation to allow "the injured workers to obtain complete recovery, thus enabling the worker to return to work and again become a productive member of society." Petitioner's Opening Brief at 20. However, courts have consistently held that rehabilitation is only one purpose of the aggravation rule. See Strachan Shipping Co. v. Nash, 782 F.2d 513, 518 (5th Cir.1986) (en banc). Among the other purposes of the rule is the policy to construe liberally the LHWCA in favor of injured employees and recovery by longshoremen. Id.; see Newport News Shipping & Dry Dock Co. v. Fishel, 694 F.2d 327, 329 (4th Cir.1982) (aggravation rule is supported by the "presumption of compensability grounded in the humanitarian nature of the [LHWCA]"). Thus the aggravation rule applies to working and retired longshoremen equally.
 
 
 46
 Second, Saif points to section 8(c)(23) of the LHWCA which provides that permanent impairment should be determined under "the guides referred to in section 902(10) of this title." 33 U.S.C. Sec. 908(c)(23). Section 902(10) provides:
 
 
 47
 "Disability" ... shall mean permanent impairment, determined (to the extent covered thereby) under the Guides to the Evaluation of Permanent Impairment promulgated and modified from time to time by the American Medical Association, in the case of an individual whose claim is described in section 910(d)(2) of this title.
 
 
 48
 33 U.S.C. Sec. 902(10). The AMA Guides discuss apportionment of respiratory disabilities between environmental causes and tobacco use. American Medical Association, Guides to the Evaluation of Permanent Impairment 86 (2d ed. 1984) ("Guides "). Thus, claims Saif, the Guides effectively overrule aggravation principles. However, assuming arguendo that the simple reference to the Guides in sections 908(c)(23) and 902(10) was meant to allow the AMA to overrule the longstanding aggravation principles as applied by the courts, Saif misreads the Guides.
 
 
 49
 The Guides refer to apportionment in three places. First, in a section entitled, "Environmental exposure, tobacco usage and chronological occupational data," the Guides instruct as follows: "Data on environmental exposures and use of tobacco are especially important when the examining physician is asked to give an opinion on apportionment. The reader should consult the Preface for a discussion of apportionment." Guides 86. The Preface to the Guides offers:
 
 
 50
 If apportionment is needed (see Glossary for definition), the analysis must consider the nature of the impairment and its possible relationship to each alleged factor and provide an explanation of the medical basis for all conclusions and opinions. To establish that a factor could have contributed to the impairment, the analysis and explanation should include, in accordance with scientific and epidemiologic principles, reference to the minimum exposure and to its timing that would have been necessary for the factor to have contributed to the impairment, and a discussion of the pathophysiology of the particular condition and of pertinent host characteristics.
 
 
 51
 Support for a conclusion that a factor did contribute to an impairment must rely on documentation of circumstances under which the factor was present, and verification that the actual type and extent of the exposure was of sufficient duration and had the necessary temporal relationship to the medical condition. The existence of medical impairment alone does not create a presumption of contribution by any factor with which the impairment is often associated. The establishment of nexus is a legal or administrative matter, not a medical matter.
 
 
 52
 Guides xi. Finally, the Glossary provides:
 
 
 53
 Apportionment : Apportionment is the determination of the degree to which each of various occupational or nonoccupational factors has contributed to a particular impairment. For each alleged factor, two criteria must be met:
 
 
 54
 (a) The alleged factor could have caused the impairment, which is a medical decision, and
 
 
 55
 (b) in the particular case, the factor did cause the impairment, which is a nonmedical determination.
 
 
 56
 Guides 225 (Appendix B).
 
 
 57
 Thus, rather than mandate that an apportionment be made between smoking and non-smoking disabilities, the Guides simply instruct how such an evaluation might be made.
 
 
 58
 Moreover, the ALJ accepted testimony on possible apportionment and concluded:
 
 
 59
 Dr. Edwards and Dr. Burke have testified, and I find, that even if apportionment were authorized under the Act, it would be impossible to state with any precision what portion of the claimant's condition is attributable solely to asbestos and what is attributable to other causes. In addition, both physicians have testified that the two conditions combined with one another in a synergistic, rather than additive, effect to produce the claimant's total impairment, which I find to be equivalent to 40 percent permanent partial disability.
 
 
 60
 This finding was supported by the testimony of Drs. Edwards and Burke, and was not contradicted by any other evidence. Thus this finding of the ALJ and the Board is supported by substantial evidence, and for this reason we affirm this portion of the ALJ's and the Board's award. See 33 U.S.C. Sec. 921(b)(3) ("the findings of fact and a decision under review by the Board shall be conclusive if supported by substantial evidence in the record considered as a whole."); Kaiser Steel Corp., 812 F.2d at 521.
 
 
 61
 THE BOARD'S ORDER IS AFFIRMED.
 
 
 
 [1]
 The Bernardo case actually arose under the Black Lung Benefits Act, 30 U.S.C. Sec. 932(a), which adopts section 921(c) of the LHWCA. Bernardo, 772 F.2d at 577
 
 
 [2]
 We are not required to affirm for the reasons given by the Board. See 33 U.S.C. Sec. 921(c) (Supp. V 1987); Todd Shipyards Corp. v. Director, O.W.C.P., 848 F.2d 125, 127 n. 3 (9th Cir.1988)
 
 
 [3]
 We note that this case presents a far less compelling case than Reid for requiring the exhaustion of an argument where it is undisputed that "a final order" of the Board was rendered. In Reid, the applicable statute provided: "No objection to an order of the Board or Secretary of Transportation shall be considered by the court unless such objection shall have been urged before the Board or Secretary of Transportation or, if it was not so urged, unless there were reasonable grounds for failure to do so." 49 U.S.C. App. Sec. 1486(e) (emphasis added). 765 F.2d at 1460. There is no comparable language in the LHWCA